## KWONG HOW v. UNITED STATES.
### LOO CHOO v. SAME.
### No. 7327.

Circuit Court of Appeals, Ninth Circuit.
May 31, 1934.

Allan A. Bynon and Chas. W. Erskine, both of Portland, Or., for appellants.

Carl C. Donaugh, U. S. Atty., and Edwin D. Hicks and Mason Dillard, Asst. U. S. Attys., all of Portland, Or., for the United States.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

GARRECHT, Circuit Judge.

The appellants, Kwong How and Loo Choo were, on the 5th day of June, 1933, separately indicted for violation of the Harrison Anti-Narcotic Act, § 9 (26 USCA § 705), and the Jones-Miller Act, § 1 (21 USCA § 174). By stipulation of counsel the two cases were tried at the same time and before the same jury. Appellant Kwong How was indicted on five counts, and was found guilty only as to count 3, which charged that the defendant did unlawfully receive and conceal and did assist in receiving and concealing narcotic drugs, illegally imported into the United States, etc. Appellant Loo Choo was indicted and convicted upon three counts of an indictment, which, in addition to containing a count which was the same as that upon which the appellant Kwong How was convicted, also charged the defendant in two oth-

er counts with having sold, dealt in, distributed, and purchased said narcotic drugs, the same having been unlawfully brought into the United States, without having been registered or having the required tax paid thereon. From the judgment of the District Court sentencing the two appellants to four years imprisonment, they have appealed to this court, it having been further agreed and stipulated between the respective attorneys that the appeal of the two cases should be consolidated.

The only question involved in this appeal is whether or not the arrest and search of appellants, and the seizure of certain merchandise and equipment and narcotic drugs from their persons at the time of their arrest was valid, it being the contention of appellants that the said arrest, search, and seizure, which was made without a warrant or legal process, was a violation of their constitutional rights as guaranteed by the Fourth Amendment to the Constitution of the United States. The determination of this issue will dispose of the question as to whether or not the trial court was in error in refusing to grant appellants' motion to suppress the evidence thus obtained, and likewise the objection made to the admission of said testimony and the sufficiency of all the evidence to justify submission of the case to the jury.

Owing to the difficulty in laying down any satisfactory general rule with regard to search and seizure and arrest without a warrant, and since the determination of each case largely depends upon the particular evidence and circumstances, we will state the facts somewhat at length and which, from the record, appear essentially as follows:

The arrests and searches and seizures complained of were made at 10 o'clock at night on the 10th day of May, 1933, in a building designated as 246 Oak street in Portland, Or. There are two separate buildings involved in this case. One is a building on Second street, and is known by its entrance number as 87½ Second street. This building lies in about the middle of the block on Second street between Oak and Stark streets. The other building, a Chinese dwelling house, in which these two appellants were arrested, is known as 246 Oak street, and is situated in the middle of the block on Oak street, between Second and Third streets. 246 Oak street abuts the rear of 87½ Second street at right angles, though there are other buildings occupying the corner of this street intersection within the angle formed by 87½ Second street and 246 Oak street. There is no alley or passageway be-

tween the two buildings we are concerned with in this case, and no rear exits to the building known as 87½ Second street, save the one described in the testimony of the government agent as being a secret passageway.

The premises known as 87½ Second street had been under the observation of federal narcotic agents for approximately five months. The agents had made numerous purchases of narcotics from different Chinese at that address, the last purchase having been made as recently as 4 o'clock p. m. on the day of the arrest here in question.

Five federal narcotic agents met at about 10 o'clock p. m. on the night of May 10, 1933, for the purpose of making a concerted drive or raid on the premises known as 87½ Second street, believing, by reason of the fact that they had repeatedly caused narcotics to be purchased from those premises, that the crime charged was therein being committed at that time. These officers were of the opinion at that time that there existed a secret rear exit from the mezzanine floor of 87½ Second street through and into the second story of 246 Oak street. To prevent and guard against any attempt at escape by means of such a passageway, it was agreed that Officer Morris, who was familiar with the Oak street premises and who had been inside thereof on several occasions, should go there and stand guard while the other four officers conducted the search of 87½ Second street. This house (246 Oak street) is described as being somewhat in the nature of an apartment house, it being a two-story structure, the first floor of which was occupied by one family of Chinese, while the upper floor was occupied by several Chinese people, not members of the same family.

Officer Morris testified that he gained admission to the premises in question by ringing the front doorbell; that a Chinaman answered the bell, and he stated to the Chinaman that he would like to go inside, and that this Chinaman willingly admitted him.

The officer testified that after entering the premises he proceeded along a hallway and ascended a flight of stairs leading to the second floor, and that he stationed himself on a landing or hallway at the head of these stairs in front of what he knew to be a secret door or panel, and through which the appellants emerged. This panel door he described as being constructed out of the same kind of material as the walls and ceiling; as being matched with and painted the same as the walls and ceiling; and, commenting upon its disguised and camouflaged appearance, he

concluded by saying that "You would have to know where the door was in order to find it."

At the time of the arrest the defendants were emerging from a small room having only one other door leading to a larger room, both of which were within the premises known as 246 Oak street, the larger room leading directly into the rear of 87½ Second street. This last-mentioned passageway from the larger room in 246 Oak street into the rear of 87½ Second street was through a wall constructed in like manner to the one previously described and presented a very similar appearance. The arrangement clearly was one of a secret exit.

■ The officer testified that after having waited a few minutes in the hallway or landing previously referred to, this panel door opened and the appellant Kwong How stepped into this hallway, Loo Choo following closely behind him, and that both of them appeared at the time to be in flight. At the same time, and before placing the appellants under arrest, the officer stated that he observed that Kwong How was carrying a satchel or handbag in one hand; that the same was hanging open and in the bottom thereof he could see several small packages, which outwardly had all the appearance of being bindles of narcotics. In the other hand Kwong How carried a small sack which closed at one end with a string and which appeared to contain opium pipes, and protruding from which the officer saw the end of what appeared to be an opium pipe. At about the same time the officer observed the other appellant, Loo Choo, a couple of steps behind Kwong How. He (Loo Choo) was carrying a pail in which were lamps or globes expressly designed and used for cooking opium, and which the arresting officer immediately recognized as opium lamps.

The record discloses that there was no light burning in the hallway where the arrests were made; that the only illumination was an eight or ten-watt lamp within the small room out of which the appellants emerged; and that prior to the opening of the door of said room leading to the hallway, Officer Morris was in darkness. The appellants contend that under these circumstances there was not sufficient light to permit the officer to have observed that which he testified he saw in appellants' possession prior to making the arrest. When the appellants opened the said panel door, a shaft or beam of light would be emitted from the small room into the hallway, and as they emerged it would naturally light their path. While this court is of the opinion that under these conditions there was ample light to enable the arresting officer to observe what the appellants had in their possession, it will suffice to say that the question raised is one which goes only to the weight of the officer's testimony, and that being a matter entirely within the province of the jury to determine, it is not the business or duty of this court to again decide the matter on appeal.

After placing both appellants under arrest, the officer immediately proceeded to search them and found that both of them had narcotics on their person; that the satchel referred to was laden with narcotics of different varieties, and also the sack, when opened, revealed the presence of opium pipes, as theretofore suspected. Appellant Loo Choo admitted ownership of the smoking apparatus and equipment, as well as the satchel and the narcotics therein contained, which was being carried by appellant Kwong How.

The appellant Loo Choo stated that the rooms herein described were his residence, but other evidence makes this statement doubtful. The uncontradicted testimony of the federal agent who made the arrests described these rooms as being unoccupied as living quarters at the time of the arrest and for some time prior thereto, and that they were fitted up and equipped particularly for opium smoking purposes.

The appellant Kwong How did not live in any of the premises described herein; he disclaimed all dominion over the place and property. He testified that he was a Chinese grocery merchant and had gone to these rooms on the night in question for the purpose of collecting a grocery bill from Loo Choo; that at the time of his arrest he was merely assisting Loo Choo in the removal of certain property from the latter's rooms; that he was entirely ignorant as to what was contained in the satchel he was carrying; that the narcotics which were found in his vest pocket by the arresting officer were placed there by Loo Choo; and that he was totally unaware as to the contents of those packages or bindles at the time Loo Choo slipped them into his pocket.

■ According to the weight of authority, the proper test by which this case should be decided, is, were the circumstances presented to the officer through the testimony of his senses together with knowledge of repeated violations of the law and the commission of similar crimes in the abutting and connected premises, sufficient to justify him as a reasonable man in believing that the appellants had

in their possession narcotics in violation of law? Or to state the same proposition differently, was there probable cause for the officer to believe that the defendants were at the time of their arrest engaged in the commission of the crime charged. See Poldo v. U. S. (C. C. A.) 55 F.(2d) 866.

A definition of probable cause, suitable to the circumstances of this case, is set forth in Garske v. U. S. (C. C. A.) 1 F.(2d) 620, 623, as follows:

"Probable cause for an arrest has been defined to be a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty."

The same rule is also enunciated in 2 R. C. L. 451. The leading United States Supreme Court case of Carroll v. U. S., 267 U. S. 132, 161, 45 S. Ct. 280, 288, 69 L. Ed. 543, 555, 39 A. L. R. 790, quoting from Stacey v. Emery, 97 U. S. 642, 645, 24 L. Ed. 1035, 1036, in defining probable cause said:

"If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been committed, it is sufficient."

Continuing, the court went on to state that in McCarthy v. De Armit, 99 Pa. 63, the Supreme Court of Pennsylvania sums up the definition of probable cause in this way:

"The substance of all the definitions is a reasonable ground for belief of guilt."

The case of Green v. U. S. (C. C. A.) 289 F. 236, presents a situation not unlike the one at bar. In that case the defendants, who for some weeks prior to their arrest had been under surveillance by narcotic agents as suspected dealers in narcotic drugs, were seen carrying a grip and entering a drug store, which was notorious as a rendezvous for drug peddlers. Later the same day when the defendants were about to again enter this same drug store, one of the defendants still carrying a grip, the federal narcotic agents placed them under arrest. There the court held that there was probable cause to believe that they were engaged in the commission of a crime, which justified the arrest and search by the government agents without a warrant, and that the narcotic drugs found in their possession were admissible in evidence against them.

In the case of Pong Ying v. U. S. (C. C. A.) 66 F.(2d) 67, 68, the federal narcotic officers, proceeding solely upon hearsay information received from the office of the Narcotic Squad in New York that opium was being smoked at the premises in question, went at once to those premises, which was a public apartment building. Apartment No. 5 in question was fixed up for opium smoking purposes "and it had a door on there that is not ordinarily an apartment house door unless it is for a purpose other than legitimate." The agents detected fumes of opium outside of this door and heard people running within the room, and knocking at the door and receiving no response, they forced it open, arrested the defendant, and seized the contraband articles in question. The court there held that the action of the narcotic agents in proceeding to arrest defendant and search his apartment without a warrant of arrest or search was reasonable within the meaning of the Fourth Amendment to the Constitution. In its opinion the court stated that:

" * * * The proof of guilty conduct within the apartment was evidenced outside the door. To throw a shield of constitutional protection over a lawbreaker who has himself created the evidence on the outside of his premises that the law is being violated within such premises is to make the constitutional provision not a means of protecting against unwarranted entrance, but a barrier to lawful entrance by a vigilant officer. * * * The claim of constitutional privilege in this case has not a trace of legality in it."

See, also, Earl et al. v. U. S. (C. C. A.) 4 F.(2d) 532; McFarland v. U. S. (C. C. A.) 65 F.(2d) 74.

Considering the facts and circumstances in the case at bar, this court is constrained to hold that there was no invasion of appellants' constitutional rights as guaranteed by the Fourth Amendment. Without lengthy repetition of the facts, it appeared that the arresting officer in this case had long experience in the enforcement of the narcotic laws, knew the premises, knew of numerous previous law violations, and knew that 87½ Second street was a Chinese narcotic establishment. In the circumstances presented, he, or any other reasonable man, would believe that the persons violating the law in 87½ Second street would attempt to escape, upon the approach of the officers, and in the escape would use the secret rear exit. He saw instrumentalities of the crime in the hands of both of the appellants at the time of the arrest; he saw the appellants in flight.

Flight is another element of probable cause which is not to be lost sight of here. In the case of Garske v. U. S., supra, the flight of the accused is noted as an important circumstance in the knowledge of the officer,

justifying arrest and search of the person without a warrant. In Cornelius on Search and Seizure at page 133, the following language appears:

"* * * The flight of a person after the commission of a crime and before arrest, is, under the prevailing rule, a circumstance to be considered with other circumstances in the case in determining his guilt or innocence."

In Allen v. U. S., 164 U. S. 492, 17 S. Ct. 154, 157. 41 L. Ed. 528, speaking on the subject of flight of the defendant, the court said:

"* * * Indeed, the law is entirely well settled that the flight of the accused is competent evidence against him as having a tendency to establish his guilt."

Appellant Loo Choo asserted that the rooms from which he and the other defendant were emerging at the time of their arrest were his private dwelling; that he made his home there. While this court is not called upon to decide the truth or falsity of this statement, and while the decision in this case is in no wise dependent thereon, it might be well to note at this period that such statement is not in accord with the evidence adduced at the trial. The record discloses that the rooms in question were not furnished or fitted up in a manner likely to cause one to believe that they were a place of lawful habitation, but on the other hand it reveals them to have been especially designed and equipped for the sole and express purpose of opium smoking.

■ Appellant Kwong How, who did not reside in the premises in question and who claimed no interest in the merchandise and other property seized, comes within the principles of the case of Kelley v. U. S. (C. C. A.) 61 F. (2d) 843, 846, 86 A. L. R. 238, wherein it was stated that:

"The question seems well settled * * * that one who is not the owner, lessee, or lawful occupant of the premises searched cannot raise the question under the Fourth Amendment of unlawful search and seizure. * * *"

To the same effect: Armstrong v. U. S. (C. C. A.) 16 F. (2d) 62; Coon v. U. S. (C. C. A.) 36 F. (2d) 164; Nixon v. U. S. (C. C. A.) 36 F. (2d) 316. In U. S. v. Mandel et al. (D. C.) 17 F. (2d) 270, 273, the court said:

"* * * Mere physical custody of incriminatory evidence is not enough to entitle one to invoke the protection of the amendment. * * *"

And again by the Supreme Court in Wilson v. U. S., 221 U. S. 361, 380, 31 S. Ct. 538, 544, 55 L. Ed. 771, 779, Ann. Cas. 1912D, 558:

"But the physical custody of incriminating documents does not of itself protect the custodian against their compulsory production. * * *"

In his testimony Kwong How also asserted that he was totally unaware of the nature of the articles which he alleged Loo Choo slipped into his pocket, as well as being ignorant of the contents of the satchel he was carrying at the time of his arrest. Such statement is untenable in the light of his exclamations at the time of his apprehension, when he cried out to Loo Choo, in Chinese, "My God, you are spoiling me, ruining me." Such a remark would seem to clearly indicate a state of mind conscious and aware of the reason for his arrest—knowledge that he was engaged in the commission of an unlawful act, and apparently was so interpreted by the jury.

Appellants rely upon the case of Hernandez v. U. S. (C. C. A.) 17 F. (2d) 373. The facts in that case were as follows: The defendant was seen coming from a house wherein narcotics were suspected of having been sold, in the company of a woman suspected of being a narcotic dealer, and, as both of them were walking down the street they looked around in what the officers thought was "a rather suspicious way." Both were arrested and searched and the defendant found to have narcotics in his pocket. The court there correctly held that such circumstances did not justify an arrest and search without a warrant, but at the most constituted mere suspicion. It is sufficient to say, without reiterating the facts already set forth in detail, that in the case at bar the circumstances presented to the federal agent were far different from those in the Hernandez case, where the officers did not actually know of the existence of a single incriminating fact or circumstance, but relied and acted altogether on suspicion.

Likewise, after having made a perusal of the other cases cited and relied upon by appellants, this court is forced to the conclusion that while the principles of law therein set forth are no doubt correct, the facts and circumstances in all of said cases are readily distinguishable from the case at bar, and consequently do not serve in determining the issues here involved.

The evidence discloses that in the case at bar the narcotic officer had just and probable cause to warrant the arrest of the appellants,

and having made a legal arrest, he had the right to search their persons and premises and to take from them narcotics, the mere possession of which, under the circumstances existing, constituted a felony.

"* * * When a man is legally arrested for an offense, whatever is found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution. * * *" Carroll v. U. S., supra.

To the same effect: Sayers v. U. S. (C. C. A.) 2 F.(2d) 146; Mattus v. U. S. (C. C. A.) 11 F.(2d) 503; Agnello v. U. S. (C. C. A.) 290 F. 671.

The trial court was not in error in denying appellants' motion to suppress the evidence thus obtained, and neither did the court err in refusing to grant the motion for a directed verdict.

The judgment of the District Court is affirmed.