# DAVIS v. UNITED STATES.

No. 404.   Argued February 5, 1946.—Decided June 10, 1946.

*Samuel Mezansky* argued the cause for petitioner. With him on the brief were *Irving Spieler* and *Moses Polakoff.*

*John J. Cooney* argued the cause for the United States. With him on the brief were *Solicitor General McGrath, Robert S. Erdahl* and *Leon Ulman.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioner was convicted under an information charging him with unlawfully having in his possession on June 20, 1944, 168 gasoline ration coupons, representing 504 gallons of gasoline.[1] The judgment of conviction was sustained

---

[1] The information charged a violation of § 2 (a) of the Act of June 28, 1940, 54 Stat. 676, as amended by the Act of May 31, 1941, 55 Stat. 236 and by Title III, § 301 of the Second War Powers Act of March 27, 1942, 56 Stat. 177, 50 U. S. C. App., Supp. IV § 633. Sec. 2 (a) provides in part:

"(2) . . . Whenever the President is satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of any material or of any facilities for defense or for private account or for export, the President may allocate such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense.

"(3) The President shall be entitled to obtain such information from, require such reports and the keeping of such records by, make such inspection of the books, records, and other writings,

by the Circuit Court of Appeals (151 F. 2d 140) over the objection that there was an unlawful search which resulted in the seizure of the coupons and their use at the trial in

> premises or property of, any person . . ., and make such investigations, as may be necessary or appropriate, in his discretion, to the enforcement or administration of the provisions of this subsection (a).

> .        .        .        .        .

> "(5) Any person who willfully performs any act prohibited, or willfully fails to perform any act required by, any provision of this subsection (a) or any rule, regulation, or order thereunder, whether heretofore or hereafter issued, shall be guilty of a misdemeanor, and shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than one year, or both."

The Office of Price Administration, to which that power had been delegated, issued ration orders for gasoline. Ration Order No. 5C, as it read on June 20, 1944 (8 Fed. Reg. 16423), provided in part as follows:

Sec. 1394.8177 (c): "No person shall have in his possession any gasoline deposit certificate, folder, or any coupon book, inventory or other coupon (whether or not such book was issued as a ration book and whether or not such coupon was issued as a ration or as part of a ration book) or other evidence, or any identifying folder, except the person, or the agent of the person, to whom such book, coupon, certificate or folder was issued or by whom it was acquired in accordance with the provisions of Ration Book [*sic*] No. 5C."

Sec. 1394.8217 (a): "Every dealer and intermediate distributor shall be accountable for all gasoline, ration credits, gasoline deposit certificates, coupons and other evidences received by him. Gasoline deposit certificates, coupons and other evidences received at or for a place of business shall be, at all times when the dealer or distributor is open to transact business, retained by him at the place of business for which they were received, or deposited in a ration bank account maintained for that place of business, until such time as they are surrendered to a dealer or distributor in exchange for gasoline, or otherwise surrendered pursuant to Ration Order No. 5C. The aggregate gallonage value of gasoline deposit certificates, coupons and other evidences on hand or on deposit for each place of business of a dealer or intermediate distributor, shall, at all times, be equal to, but not in excess of, the number of gallons of gasoline which would be required to fill the storage capacity of such place of business, as shown by the current certificate of registration, . . ." 8 Fed. Reg. 15981.

violation of the rule of *Weeks* v. *United States,* 232 U. S. 383, *United States* v. *Lefkowitz,* 285 U. S. 452, and related cases. The case is here on a petition for a writ of certiorari which we granted because of the importance of the question presented.

Davis was president of a corporation by the name of Davis Auto Laundry Corporation which maintained a gasoline filling station in New York City. He was suspected of running a black market in gasoline. Several agents drove to a place near the gasoline station and observed it for a few hours. They had no search warrant nor a warrant for the arrest of petitioner. Two of the agents drove their cars into the station and asked for gas. Petitioner was not present at the time. But an attendant, an employee of petitioner, was present and waited on them. Through her each of the two agents succeeded in purchasing gas without gasoline ration stamps by paying twenty cents a gallon above the ceiling price. Shortly thereafter they arrested her for selling gasoline without coupons and above the ceiling price. She said that in doing so she was following petitioner's instructions. While she was being questioned by the agents, petitioner returned to the station in his car. They immediately arrested him on the same charge as the attendant[2] and searched his car. They demanded and received from him the keys to tin boxes attached to the gasoline pumps and in which gasoline ration coupons were kept. One of them began to examine and measure the gasoline storage tanks and their contents. It soon appeared that the gasoline ration coupons found in the tin boxes were not sufficient

---

[2] Selling gasoline without receipt of ration coupons, selling gasoline in excess of the ceiling price, or unlawfully possessing ration coupons is a misdemeanor. See § 2 (a), *supra,* note 1. A felony is an offense punished by death or imprisonment for a term exceeding one year. Criminal Code § 335, 18 U. S. C. § 541.

to cover the amount by which the capacity of the storage tanks had been diminished by sales.

While this examination of the storage tanks was under way, petitioner went with two of the agents into his office which was on the premises.[3]  The office consisted of a waiting room and inner room.   He was questioned in the waiting room for about an hour.   A door led from the waiting room into the inner room where records were kept. The door to it was locked.   Petitioner at first refused to open it.   When told that the examination of the tanks had revealed a shortage of coupons, petitioner assured the agents that he had sufficient coupons to cover the shortage and that they were in the locked room.   The officers asked to see the coupons and based their demand on the fact that the coupons were property of the Government of which petitioner was only the custodian.   Petitioner persisted, however, in his refusal to unlock the door.   Before long he did unlock it, took from a filing cabinet the coupons on which the conviction rests, and gave them to the agents. He testified that he did so because the agents threatened to break down the door if he did not.   The District Court did not believe petitioner's version of the episode.   One agent testified: "Q. Did you try to convince Davis that he ought to open that door leading into the private office? A. I didn't try to convince him.   I told him that he would have to open that door.   Q. Did you tell him if he did not you would break it down?   A. I did not tell him that at all."   And it appeared that while the two agents were talking with Davis in the waiting room, another agent was in the rear shining a flashlight through an outside window of the inner room and apparently trying

---

[3] The filling station was located in a building about 250 feet long. One set of pumps was near the entrance to one street; the other set was at the opposite end near the entrance to another street.   The office was located about half-way between the two sets of pumps.

to raise the window. According to one of the agents, when petitioner saw that, he said, "He don't need to do that. I will open the damned door." Some six weeks later petitioner was arrested on a warrant and arraigned.

The District Court found that petitioner had consented to the search and seizure and that his consent was voluntary. The Circuit Court of Appeals did not disturb that finding, although it expressed some doubt concerning it. In its view, the seized coupons were properly introduced into evidence because the search and seizure, being incidental to the arrest, were "reasonable" regardless of petitioner's consent.

The Fourth Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

And the Fifth Amendment provides in part that "No person . . . shall be compelled in any criminal case to be a witness against himself . . ."

The law of searches and seizures as revealed in the decisions of this Court is the product of the interplay of these two constitutional provisions. *Boyd* v. *United States,* 116 U. S. 616. It reflects a dual purpose—protection of the privacy of the individual, his right to be let alone; protection of the individual against compulsory production of evidence to be used against him. *Boyd* v. *United States, supra; Weeks* v. *United States, supra.* And see *Oklahoma Press Pub. Co.* v. *Walling,* 327 U. S. 186.

· We do not stop to review all of our decisions which define the scope of "reasonable" searches and seizures. For they have largely developed out of cases involving

the search and seizure of *private* papers. We are dealing here not with *private* papers or documents, but with gasoline ration coupons which never became the private property of the holder but remained at all times the property of the Government and subject to inspection and recall by it.

At the times relevant here, gasoline was rationed. Dealers could lawfully sell it only on receipt of ration coupons.[4] They in turn could receive their supplies of gasoline from the distributors only on delivery of coupons.[5] It was required that a dealer at all times have coupons on hand at his place of business or in a bank equal to but not in excess of the gallonage necessary to fill his storage tanks.[6] Possession of coupons obtained in contravention of the regulations was unlawful.[7] The coupons remained the property of the Office of Price Administration[8] and were at all times subject to recall by it.[9] And they were subject to inspection at all times.[10]

---

[4] See Ration Order No. 5C, *supra,* note 1, §§ 1394.8152, 1394.8153.

[5] *Id.,* § 1394.8207.

[6] *Id.,* § 1394.8217 (a), *supra.*

[7] *Id.,* § 1394.8177 (c), *supra,* note 1.

[8] *Id.,* § 1394.8227 (b) provided that all "gasoline deposit certificates and all coupon books, coupons, and other evidences are, and when issued shall remain, the property of the Office of Price Administration."

[9] *Id.,* § 1394.8104 (a):

"All coupon books, bulk coupons, inventory coupons, other evidences . . . are, and when issued shall remain, the property of the Office of Price Administration. The Office of Price Administration may refuse to issue, and may suspend, cancel, revoke, or recall any ration and may require the surrender and return of any coupon book, bulk coupon, inventory coupons or other evidences . . . during suspension or pursuant to revocation or cancellation, whenever it deems it to be in the public interest to do so."

[10] *Id.,* § 1394.8227 (b) provided in part:

"Upon demand made by any investigator of the Office of Price Administration or by any police officer, constable, or other law

We are thus dealing not with *private* papers or documents but with *public* property in the custody of a citizen. The distinction between the two classes of property in the law of searches and seizures was recognized in *Wilson* v. *United States,* 221 U. S. 361, 380, where the Court stated:

> "But the physical custody of incriminating documents does not of itself protect the custodian against their compulsory production. The question still remains with respect to the nature of the documents and the capacity in which they are held. It may yet appear that they are of a character which subjects them to the scrutiny demanded and that the custodian has voluntarily assumed a duty which overrides his claim of privilege. This was clearly implied in the *Boyd Case* where the fact that the papers involved were the *private* papers of the claimant was constantly emphasized. Thus, in the case of public records and official documents, made or kept in the administration of public office, the fact of actual possession or of lawful custody would not justify the officer in resisting inspection, even though the record was made by himself and would supply the evidence of his criminal dereliction. If he has embezzled the

enforcement officer of the United States or of any state, county, or local government, every person shall produce for inspection any tire inspection record and gasoline deposit certificate and any gasoline coupon books, coupons, and other evidences in his possession or control, whether valid, invalid, void or expired . . . in accordance with Ration Order No. 5C. Investigators of the Office of Price Administration and all police officers, constables and other law enforcement officers of the United States, or of any state, county or local government are authorized to make such inquiries of any person as may be pertinent to determine whether a violation of Ration Order No. 5C has been or is being committed, and are authorized to receive the surrender of all gasoline deposit certificates, gasoline coupon books, coupons and other evidences acquired by any person otherwise than in accordance with Ration Order No. 5C, whether valid, invalid, void or expired."

As to the power of inspection given by the Act of June 28, 1940, see § 2 (a) (3), *supra,* note 1.

public moneys and falsified the public accounts he cannot seal his official records and withhold them from the prosecuting authorities on a plea of constitutional privilege against self-crimination. The principle applies not only to public documents in public offices, but also to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation and the enforcement of restrictions validly established. There the privilege, which exists as to private papers, cannot be maintained."

The Court proceeded to analyze the English and American authorities and added, pp. 381–382:

"The fundamental ground of decision in this class of cases, is that where, by virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the demanding authority, the custodian has no privilege to refuse production although their contents tend to criminate him. In assuming their custody he has accepted the incident obligation to permit inspection."

The distinction is between property to which the Government is entitled to possession and property to which it is not.[11] See 8 Wigmore on Evidence (3d ed.) § 2259c.

---

[11] This distinction was noted in another connection in *Boyd* v. *United States, supra,* pp. 623–624, where the Court said:

"The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him. The two things differ *toto coelo.* In the one case, the government is entitled to the possession of the property; in the other it is not. The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement

The distinction has had important repercussions in the law, beyond that indicated by *Wilson* v. *United States,* *supra.* For an owner of property who seeks to take it from one who is unlawfully in possession has long been recognized to have greater leeway than he would have but for his right to possession. The claim of ownership will even justify a trespass and warrant steps otherwise unlawful. *Richardson* v. *Anthony,* 12 Vt. 273; *Madden* v. *Brown,* 8 App. Div. 454, 40 N. Y. S. 714; *State* v. *Dooley,* 121 Mo. 591, 26 S. W. 558.

We do not suggest that officers seeking to reclaim government property may proceed lawlessly and subject to no restraints. Nor do we suggest that the right to inspect under the regulations subjects a dealer to a general search of his papers for the purpose of learning whether he has any coupons subject to inspection and seizure. The nature of the coupons is important here merely as indicating that the officers did not exceed the permissible limits of persuasion in obtaining them.

---

of the government. The first statute passed by Congress to regulate the collection of duties, the act of July 31, 1789, 1 Stat. 29, 43, contains provisions to this effect. As this act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as 'unreasonable,' and they are not embraced within the prohibition of the amendment. So, also, the supervision authorized to be exercised by officers of the revenue over the manufacture or custody of excisable articles, and the entries thereof in books required by law to be kept for their inspection, are necessarily excepted out of the category of unreasonable searches and seizures. So, also, the laws which provide for the search and seizure of articles and things which it is unlawful for a person to have in his possession for the purpose of issue or disposition, such as counterfeit coin, lottery tickets, implements of gambling, &c., are not within this category. *Commonwealth* v. *Dana,* 2 Met. (Mass.) 329."

And see *Tennessee* v. *Hall,* 164 Tenn. 548, 51 S. W. 2d 851; *State* v. *Knight,* 34 N. M. 217, 279 P. 947; *State* v. *Bennett,* 315 Mo. 1267, 288 S. W. 50.

They appeared on the premises during business hours. They had ocular evidence that a misdemeanor had been committed, a crime to which petitioner was an aider or abetter,[12] since, according to the attendant, she made the illegal sales pursuant to petitioner's instructions. Since sales were being made without receipt of coupons from customers, it was fair to assume (unless, as was at no time suggested, the business was being liquidated) that petitioner somewhere had a supply of coupons adequate to replenish his storage tanks. The inspection which was made was an inspection of the tanks attached to the pumps. And the search was of the office adjacent to the pumps—the place where petitioner transacted his business. Moreover, the officers demanded the coupons on the basis that they were property of the Government and that petitioner was merely the custodian of them. And there was no general, exploratory search. Only the contraband coupons were demanded; only coupons were taken.

These facts distinguished this case from such cases as *Amos* v. *United States,* 255 U. S. 313, where officers without a search warrant swoop down on a private residence, obtain admission through the exertion of official pressure, and seize private property. The filling station was a place of business, not a private residence. The officers' claim to the property was one of right. For the coupons which they demanded to see were government property. And the demand was made during business hours. Whatever may be the limits of inspection under the regulations, law enforcement is not so impotent as to require officers, who have the right to inspect a place of business, to stand

---

[12] Criminal Code § 332, 18 U. S. C. § 550, provides:

"Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal."

mute when such clear evidence of criminal activity is known to them.

Where the officers seek to inspect *public* documents at the place of business where they are required to be kept, permissible limits of persuasion are not so narrow as where *private* papers are sought. The demand is one of right. When the custodian is persuaded by argument that it is his duty to surrender them and he hands them over, duress and coercion will not be so readily implied as where private papers are involved. The custodian in this situation is not protected against the production of incriminating documents. *Wilson* v. *United States, supra.* The strict test of consent, designed to protect an accused against production of incriminating evidence, has no place here. The right of privacy, of course, remains. But, as we have said, the filling station was a place of business, not a private residence. The right to inspect existed. And where one is seeking to reclaim his property which is unlawfully in the possession of another, the normal restraints against intrusion on one's privacy, as we have seen, are relaxed. The District Court found, after hearing the witnesses, that petitioner consented—that although he at first refused to turn the coupons over, he soon was persuaded to do so and that force or threat of force was not employed to persuade him. According to the District Court, the officers "persuaded him that it would be a better thing for him to permit them to examine" the coupons; "they talked him into it." We cannot say as a matter of law that that finding was erroneous. The public character of the property, the fact that the demand was made during business hours at the place of business where the coupons were required to be kept, the existence of the right to inspect, the nature of the request, the fact that the initial refusal to turn the coupons over was soon followed by acquiescence in the demand—these circum-

stances all support the conclusion of the District Court.
We accordingly affirm the judgment below without reach-
ing the question whether but for that consent the search
and seizure incidental to the arrest were reasonable.

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration
or decision of this case.

MR. JUSTICE FRANKFURTER, with whom MR. JUSTICE
MURPHY concurs, dissenting.

In its surface aspects this case concerns merely a squalid
effort to evade the wartime system of gasoline rationing.
But it should not be disposed of in that perspective. It
is not the first petty little case to put to the test respect
for principles which the founders of this nation deemed
essential for a free society. For the case is directly related
to one of the great chapters in the historic process whereby
civil liberty was achieved and constitutionally protected
against future inroads.

The Court's decision, as I see it, presents this issue:
May papers which an accused could not be compelled to
produce even by a judicial process of a search warrant be
taken from him against his will by officers of the law
without such judicial process for use as evidence in a
criminal prosecution against him? Judicial process may
not compel the production of documents either because
of the protection of the Fifth Amendment against self-
crimination, or, as in this case, because the authorization
by Congress of search warrants is withheld in a situation
like the present.[1] The Court apparently rules that be-
cause the gasoline business was subject to regulation, the

---

[1] The petitioner was arrested for the sale of gasoline without coupons
and at a price greater than that authorized by the Office of Price
Administration ceilings; he was prosecuted for the illegal possession

search and seizure of such documents without a warrant is not an unreasonable search and seizure condemned by the Fourth Amendment. To hold that the search in this case was legal is to hold that a search which could not be justified under a search warrant is lawful without it. I cannot escape the conviction that such a view of the Fourth Amendment makes a travesty of it and of the long course of legislation in which Congress applied that Amendment.

Where search is made under the authority of a warrant issued from a judicial source, the scope of the search must be confined to the specific authorization of the warrant. It cannot be that the Constitution meant to make it legally advantageous not to have a warrant, so that the police may roam freely and have the courts retrospectively hold that the search that wâs made was "reasonable," reasonableness being judged from the point of view of obtaining relevant evidence. I had supposed that that was precisely what the Fourth Amendment was meant to stop. "The Government could desire its possession only to use it as evidence against the defendant and to search for and seize it for such purpose was unlawful." *Gouled* v. *United States*, 255 U. S. 298, 310.

There is indeed a difference between private papers and papers having also a public bearing. Private papers of an accused cannot be seized even through legal process because their use would violate the prohibition of the Fifth Amendment against self-crimination. So-called public papers—papers in which the public has an interest

---

of gasoline ration documents. These offenses are misdemeanors. 56 Stat. 176, 179, 50 U. S. C. App. § 633 (5).

The Espionage Act limits the issuance of search warrants to those in which the property sought was stolen or embezzled, used as a means of committing a felony, or used to aid illegally a foreign nation. 40 Stat. 217, 228, 18 U. S. C. § 612. The documents involved in this case do not come within any of these categories.

other than that which they may serve as evidence in a
case—may be seized, but like all other things in an indi-
vidual's possession they can be seized only upon a prop-
erly safeguarded search. The amenability of corporate
papers to testimonial compulsion means that a corpora-
tion, because it is a corporation, cannot make claim to
the privilege of self-crimination. Nor can the custodian
of corporate books immunize them against their produc-
tion in court because they may also carry testimony
against him. The Fourth Amendment does not give free-
dom from testimonial compulsion. Subject to familiar
qualifications every man is under obligation to give testi-
mony. But that obligation can be exacted only under
judicial sanctions which are deemed precious to Anglo-
American civilization. Merely because there may be the
duty to make documents available for litigation does not
mean that police officers may forcibly or fraudulently
obtain them. This protection of the right to be let alone
except under responsible judicial compulsion is precisely
what the Fourth Amendment meant to express and to
safeguard.

An even more fundamental issue lurks in the Court's
opinion if a casual but explicit phrase about the locus
of the search and seizure as "a place of business, not a
private residence" is intended to carry relevant legal
implications. If this is an indirect way of saying that
the Fourth Amendment only secures homes against un-
reasonable searches and seizures but not offices—private
offices of physicians and lawyers, of trade unions and
other organizations, of business and scientific enterprises—
then indeed it would constitute a sudden and drastic break
with the whole history of the Fourth Amendment and
its applications by this Court. See *Olmstead* v. *United
States*, 277 U. S. 438, 477, and cases cited in footnotes
5, 6, and 7. I cannot believe that a vast area of civil

liberties was thus meant to be wiped out by a few words, without prior argument or consideration.

The course of decision in this Court has thus far jealously enforced the principle of a free society secured by the prohibition of unreasonable searches and seizures. Its safeguards are not to be worn away by a process of devitalizing interpretation. The approval given today to what was done by arresting officers in this case indicates that we are in danger of forgetting that the Bill of Rights reflects experience with police excesses. It is not only under Nazi rule that police excesses are inimical to freedom. It is easy to make light of insistence on scrupulous regard for the safeguards of civil liberties when invoked on behalf of the unworthy. It is too easy. History bears testimony that by such disregard are the rights of liberty extinguished, heedlessly at first, then stealthily, and brazenly in the end.

The issue in this case is part of a long historic process and proper consideration of the problem before us compels rather extended discussion. These are the circumstances that give rise to our problem. For some time operations of the gasoline station owned by Davis under a corporate form had been suspect by the Office of Price Administration. On the day of the questioned seizure, three O. P. A. investigators and two New York City detectives kept watch on the station for several hours. One of the O. P. A. men drove his car to the pumps for gas. After the attendant had filled his tank, he told her, when asked for coupons, that he had none. She then demanded a higher price for the gasoline which he paid with a marked five dollar bill. Later, another investigator repeated this performance. Then all five officers went into the station, notified the attendant that she was under arrest, and requested and obtained from her the two marked bills and a card on which she had recorded the sales. While the girl's ques-

tioning was still proceeding, Davis drove into the station. His car was immediately searched and he was charged with selling gas over ceiling prices and without coupons. These were charges of misdemeanors. The officers then demanded and received from Davis keys for the locked boxes on the pumps intended for the deposit of coupons received for gas sold. While some of the officers were engaged in checking the discrepancy between the amount of gas in storage tanks and the coupons in the boxes, Davis was taken by two of the agents to an outer room in his office. They demanded from him gas coupons which he claimed to have in sufficient numbers to make up the deficiencies in the locked boxes. He stubbornly refused despite the insistence of one of the officers that "he would have to open that door" to his private office. Finally, when another officer flashed a light into the office from an outside window and evinced an intention to force the window, Davis unlocked the door. Thereupon he took some envelopes from a filing cabinet and handed them to the agents. These envelopes contained the stamps which formed the basis of the prosecution. He was then taken to O. P. A. headquarters and questioned, but eventually allowed to go. Several weeks later he was taken into custody and then charged with the illegal possession of gasoline ration documents. This charge also is a misdemeanor.

The petitioner made timely motions for the suppression of the evidence, see *Nardone* v. *United States,* 308 U. S. 338, 341–42, claiming that they were illegally seized and barred as evidence against him. The trial court denied these motions on the ground that Davis had voluntarily turned the stamps over to the officers. The Circuit Court of Appeals sustained the conviction but it did not accept the District Court's view that Davis had surrendered the stamps of his own free will. What the Circuit Court of Appeals thought about the matter is best expressed in

its own language: "The judge found that Davis' consent was 'voluntarily' given, and for that reason denied the motion to suppress the evidence. We need not decide that that finding is wrong, for we can dispose of the case upon other grounds; but we must own to some doubt whether a consent obtained under such circumstances should properly be regarded as 'voluntary.' Davis must have known, under arrest as he was, that the officers were not likely to stand very long upon ceremony, but in one way or another, would enter the office." 151 F. 2d 140, 142. One must reject the District Court's finding that Davis' consent went with his surrender of the documents unless one is to hold that every submission to the imminent exertion of superior force is consensual if force is not physically applied. The District Court's finding that Davis voluntarily surrendered the documents is not one of those findings of facts which appropriately calls for our acceptance. When such a finding involves conflicting evidence or the credibility of a witness, the advantage of having seen or heard a witness may be decisive. But here the issue is not as to what took place but as to the significance of what took place. And when a district court's finding of a so-called fact is as interwoven as it is here with constitutional consequences, we cannot accept a finding whereby the constitutional issue is predetermined. We are not bound by findings that operate as cryptic constitutional determinations even when they come here, unlike the present case, supported by both lower courts. See *United States* v. *Appalachian Power Co.*, 311 U. S. 377, 404. To say that a yielding to continuous pressure by arresting officers, accompanied by minatory manifestations to resort to self-help, constitutes a voluntary yielding, is to disregard ordinary experience. This Court preferred not to do that in *Amos* v. *United States*, 255 U. S. 313. We there held that where officers stated that they were revenue officers and requested ad-

mission to the premises in order to make a search, there was, as a matter of law, "implied coercion." Inasmuch "as conduct under duress involves a choice," the Fourth Amendment is hardly to be nullified by finding every submission short of overpowering force "voluntary." See *Union Pacific R. Co.* v. *Public Service Comm'n,* 248 U. S. 67, 70.

This Court also attributes voluntariness to Davis' surrender of the documents. But it does so not because it finds that what Davis did was an exercise of free choice. It does not question the doubt of the Circuit Court of Appeals whether the consent obtained from Davis was, as a psychological fact, a voluntary act. The Court derives voluntariness from the fact that what the officers compelled Davis to give up were ration coupons. But, surely, this is to assign to ordinary words a private, esoteric meaning. Common usage rejects such meaning of "voluntary" and law has not heretofore indulged it. In considering whether evidence was freely given or coerced, the law has always meant by "voluntary" what everybody else means by it. To make voluntariness turn on the nature of the quest, instead of on the nature of the response of the person in control of the sought documents, is to distort familiar notions on the basis of which the law has heretofore adjudged legal consequences. The Court accepts the Government's argument [2] which the Circuit

---

[2] A few words only need be said about the cases on which the Government relies. Most of them deal with the amenability of documents to production upon legal process. *Wilson* v. *United States,* 221 U. S. 361; *Bowles* v. *Insel,* 148 F. 2d 91; *Cudmore* v. *Bowles,* 79 U. S. App. D. C. 255, 145 F. 2d 697; *Rodgers* v. *United States,* 138 F. 2d 992; *Fleming* v. *Montgomery Ward & Co.,* 114 F. 2d 384. In the others, consent was given to inspect the papers in accordance with the provisions of the governing statute. *Bowles* v. *Beatrice Creamery Co.,* 146 F. 2d 774; *Bowles* v. *Glick Bros. Lumber Co.,* 146 F. 2d 566; *In re Sana Laboratories,* 115 F. 2d 717 (subsequent to the inspection

Court of Appeals rejected, and rejected because gravely disturbed by its implication. Though differently phrased, the argument which has here found favor evoked this comment in the concurring opinion of Judge Frank: "I add a few words only because I think it important to underscore our rejection of the following argument on which the Assistant United States Attorney chiefly relied: Whenever the government validly regulates any business and includes in its regulation a valid requirement that records be kept which shall be open to official inspection, then refusal to produce the records for such inspection authorizes the officers to enter the premises and seize the records. One variant of the argument was that refusal to permit inspection in such circumstances constitutes, in effect, the legal equivalent of consent to enter; another variant was that, in such circumstances, conduct of the defendant must be interpreted as consent to entry although, in other circumstances, the very same conduct would be regarded as refusal. In one way or another, the Assistant United States Attorney urged that obstruction of the right of the officers to inspect deprived the

---

there was a wrongful taking; the court admitted the evidence procured as a result of the inspection, but barred the documents from evidence); *C. M. Spring Drug Co.* v. *United States,* 12 F. 2d 852; *United States* v. *Kempe,* 59 F. Supp. 905; *Bowles* v. *Stitzinger,* 59 F. Supp. 94; *Bowles* v. *Curtiss Candy Co.,* 55 F. Supp. 527; *United States* v. *Sherry,* 294 F. 684 (here the documents were taken with the consent of the custodian). In *A. Guckenheimer & Bros. Co.* v. *United States,* 3 F. 2d 786, however, the situation bears some resemblance to the present case. There the Circuit Court of Appeals attributed the consent of the custodian, following continual refusal, to the command of the statute. While there was no indication, as evidenced by the opinion, that the documents were secured through fear of force, the inspection afforded was probably not voluntary. Insofar as there is support in that case for a search that transgressed the Fourth Amendment, the observations are mere dicta, since no timely objection was filed.

defendant of his usual privilege to be free of unreasonable search and seizure." 151 F. 2d at 144.

Of course there is an important difference in the constitutional protection afforded their possessors between papers exclusively private and documents having public aspects. Cf. *Weeks* v. *United States,* 232 U. S. 383, 393–94; *Gouled* v. *United States,* 255 U. S. 298, 308–309. But the essence of the difference is that under appropriate circumstances wholly private papers are not even subject to testimonial compulsion whereas other papers, once they have been legally obtained, are available as evidence. Had the coupons in controversy been secured by a proper search they could be used against the defendant at the trial. But their character does not eliminate the restrictions of the Fourth Amendment and subject the person in possession of such documents, against his protest, to searches and seizures otherwise unwarranted.

The acceptance of the Government's argument opens an alarming vista of inroads upon the right of privacy. This right the Fourth Amendment sought to protect by its general interdiction of police intrusion without prior judicial authorization through search warrants issued "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Amendment IV. Only the other day every person not in the armed forces had in his possession O. P. A. documents which technically were the property of the O. P. A., and the same situation may come to pass tomorrow; most businesses in the country are in possession of documents required to be kept under federal and State authority; and there is every prospect that this network of required records will be extended. It misconceives the issues to assume that the protection for privacy here urged would serve as a shield against scrutiny of the records of the giant industries or the great trade unions. The Fourth Amendment does not differ-

entiate between big and small enterprise. But, in any event, while our economy is extensively carried on through the corporate form, the latest available figures show that of the multitudinous income-reporting corporations only about five per cent have a net income above $100,000. It cannot be that the highly prized constitutional immunity from police intrusion, as it affects activities that permeate our national life, is now to be curtailed or viewed with laxity.

The Court's opinion has only its own reasoning to support it. Nothing that this Court has ever decided or sanctioned gives it strength. *Wilson* v. *United States,* 221 U. S. 361, invoked by the Court was a very different story. That case was concerned with the difference between the amenability of a corporation to testimonial compulsion and the immunity of an individual, under relevant circumstances, to be free from the duty to give testimony. The core of the Government's claim here is the right to seize documents in the absence of judicial process. The difference between demanding documents without legal process and seizing them on the basis of such process, is the difference between the protection of civil liberties and their invasion. The difference is the essence of the Fourth Amendment.

Indeed, so unhappy was the experience with police search for papers and articles "in home or office," *Gouled* v. *United States,* 255 U. S. 298, 308, 309, that it was once maintained that no search and seizure is valid. To Lord Coke has been attributed the proposition that warrants could not be secured even for stolen property. But see Coke, *Fourth Institute,* 176–77. Under early English doctrine even search warrants by appropriate authority could issue only for stolen goods. See 2 Hale, *Pleas of the Crown,* 113–14, 149–51; 2 Gabbett, *Criminal Law* (1843) 156 *et seq.;* 1 Chitty, *Criminal Law* (5th ed., 1847) 64 *et seq.;* Barbour, *Criminal Law* (2d ed., 1852) 499 *et*

*seq.;* 1 Archbold, *Criminal Procedure* (7th ed., 1860) 141. Certainly warrants lacking strict particularity as to location to be searched or articles to be seized were deemed obnoxious. *Ibid.;* see also 2 Hawkins, *Pleas of the Crown,* 130, 133. An attempt to exceed these narrow limits called forth the enduring judgment of Lord Camden, in *Entick* v. *Carrington,* 19 Howell's State Trials 1029, in favor of freedom against police intrusions. And when appeal to the colonial courts on behalf of these requisite safeguards for the liberty of the people failed, *Paxton's Case,* Quincy (Mass.) 51, a higher tribunal resolved the issue. The familiar comment of John Adams on Otis' argument in *Paxton's Case* can never become stale: "American independence was then and there born; the seeds of patriots and heroes were then and there sown, to defend the vigorous youth, the *non sine Diis animosus infans.* Every man of a crowded audience appeared to me to go away, as I did, ready to take arms against writs of assistance. Then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born. In fifteen years, namely in 1776, he grew up to manhood, and declared himself free." 10 Adams, *Works,* 247–248; for a description of Otis' speech in *Paxton's Case,* see 2 *id.* 523. So basic to liberty is the protection against governmental search and seizure, that every State in the Union [3] has this as a constitutional safeguard.

This bleak recital of the past was living experience for Madison and his collaborators. They wrote that experience into the Fourth Amendment, not merely its words. Mention has been made of the doubt in the minds of English and Colonial libertarians whether searches and

---

[3] This historic safeguard against unreasonable search and seizure was given formal constitutional sanction in New York in 1938. N. Y. Const. of 1938, Art. 1, § 12.

seizures could be sanctioned even by search warrants.  It is significant that Madison deemed it necessary to put into the Fourth Amendment a qualifying permission for search and seizure by the judicial process of the search warrant—a search warrant exacting in its foundation and limited in scope.  This qualification gives the key to what the framers had in mind by prohibiting "unreasonable" searches and seizures.  The principle was that all seizures without judicial authority were deemed "unreasonable." If the purpose of its framers is to be respected, the meaning of the Fourth Amendment must be distilled from contemporaneous history.  The intention of the Amendment was accurately elucidated in an early Massachusetts case.  The court there had before it the terms of the Massachusetts Constitution, on which, with like provisions in other State Constitutions, the Fourth Amendment was based:

"With the fresh recollection of those stirring discussions [respecting writs of assistance], and of the revolution which followed them, the article in the Bill of Rights, respecting searches and seizures, was framed and adopted.  This article does not prohibit all searches and seizures of a man's person, his papers, and possessions; but such only as are 'unreasonable,' and the foundation of which is 'not previously supported by oath or affirmation.'  The legislature were not deprived of the power to authorize search warrants for probable causes, supported by oath or affirmation, and for the punishment or suppression of any violation of law.  The law, therefore, authorizing search warrants in certain cases, is in no respect inconsistent with the declaration of rights." *Commonwealth* v. *Dana,* 2 Met. (Mass.) 329, 336.

Such was the contemporaneous construction of the Fourth Amendment by the Congress.  It gave specific

authorization whenever it wished to permit searches and seizures.   Beginning with the first Congress down to 1917, Congress authorized search by warrant not as a generally available resource in aid of criminal prosecution but in the most restricted way, observing with a jealous eye the recurrence of evils with which our early statesmen were intimately familiar.   For each concrete situation Congress deemed it necessary to pass a separate act.   An incomplete examination finds scores of such *ad hoc* enactments scattered through the Statutes at Large.   Not until 1917, and then only after repeated demands by the Attorney General, did Congress pass the present statute authorizing the issue of search warrants for generalized situations. 40 Stat. 217, 228, 18 U. S. C. §§ 611 *et seq.*   Even then the situations were restricted and the scope of the authority was strictly defined.   In the case before us no attempt was made to get a search warrant because none could have been got.   Congress did not authorize one either on the charges on which Davis was originally arrested or on which he was ultimately tried.   And even since the 1917 Act Congress has emphasized the importance of basing the compulsory demand for evidence upon judicial process rather than the zeal of arresting officers.   The habit of continual watchfulness against the dangers of police abuses has been reflected in that Congress has continued to authorize search warrants for particular situations by specific legislation or by reference to the 1917 Act.   These revealing enactments are summarized in an Appendix.

In the course of its decisions, with a deviation promptly retraced, this Court has likewise reflected the broad purpose of the Fourth Amendment.   The historic reach of the Amendment and the duty to observe it was expounded for the Court by Mr. Justice Bradley in *Boyd* v. *United States,* 116 U. S. 616, "a case that will be remembered as long as civil liberty lives in the United States."

Brandeis, J., in *Olmstead* v. *United States,* 277 U. S. 438, 471, at 474. The Amendment has not been read in a niggardly spirit or with the outlook of a narrow-minded lawyer.

Since the opinion in this case seems to me out of line with our prior decisions, it becomes important to recall how this Court has heretofore viewed the Fourth Amendment and what has actually been decided. I shall draw on a summary of the Court's decisions by Mr. Justice Brandeis:

"Time and again, this Court in giving effect to the principle underlying the Fourth Amendment, has refused to place an unduly literal construction upon it. This was notably illustrated in the *Boyd* case itself. Taking language in its ordinary meaning, there is no 'search' or 'seizure' when a defendant is required to produce a document in the orderly process of a court's procedure. 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,' would not be violated, under any ordinary construction of language, by compelling obedience to a subpoena. But this Court holds the evidence inadmissible simply because the information leading to the issue of the subpoena has been unlawfully secured. *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385. Literally, there is no 'search' or 'seizure' when a friendly visitor abstracts papers from an office; yet we held in *Gouled* v. *United States,* 255 U. S. 298, that evidence so obtained could not be used. No court which looked at the words of the Amendment rather than at its underlying purpose would hold, as this Court did in *Ex parte Jackson,* 96 U. S. 727, 733, that its protection extended to letters in the mails. The provision against self-incrimination in the Fifth Amendment has been given an equally broad construction.

The language is: 'No person . . . shall be compelled in any criminal case to be a witness against himself.' Yet we have held, not only that the protection of the Amendment extends to a witness before a grand jury, although he has not been charged with crime, *Counselman* v. *Hitchcock,* 142 U. S. 547, 562, 586, but that: 'It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it. The privilege protects a mere witness as fully as it does one who is also a party defendant.' *McCarthy* v. *Arndstein,* 266 U. S. 34, 40. The narrow language of the Amendment has been consistently construed in the light of its object, 'to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime. The privilege is limited to criminal matters, but it is as broad as the mischief against which it seeks to guard.' *Counselman* v. *Hitchcock, supra,* p. 562.

"Decisions of this Court applying the principle of the *Boyd* case have settled these things. Unjustified search and seizure violates the Fourth Amendment, whatever the character of the paper; whether the paper when taken by the federal officers was in the home, in an office or elsewhere; whether the taking was effected by force, by fraud, or in the orderly process of a court's procedure. From these decisions, it follows necessarily that the Amendment is violated by the officer's reading the paper without a physical seizure, without his even touching it; and that use, in any criminal proceeding, of the contents of the papers so examined—as where they are testified to by a federal officer who thus saw the document or where, through knowledge so obtained, a copy has been procured elsewhere—any such use constitutes

a violation of the Fifth Amendment." *Olmstead* v. *United States,* 277 U. S. 438, 471, at 476–478.

And so we are finally brought to the question whether the seizure of documents which could not possibly have been justified as the result of a search under a warrant, since no such warrant could have been authorized by law, can be justified as a search and seizure without a warrant. Such justification must have some historic foundation, otherwise it is clearly out of the bounds of the Fourth Amendment. The court below evidently struggled in reaching its conclusion because of some decisions here which it naturally found "not entirely harmonious." Its chief reliance was language in *Marron* v. *United States,* 275 U. S. 192. A short answer would be that the sting of the *Marron* case was taken by two later cases. *Go-Bart Co.* v. *United States,* 282 U. S. 344, 358, and *United States* v. *Lefkowitz,* 285 U. S. 452, 465. But a closer analysis is called for.

One would expect a hard-headed system like the common law to recognize exceptions even to the most comprehensive principle for safeguarding liberty. This is true of the prohibition of all searches and seizures as unreasonable unless authorized by a judicial warrant appropriately supported. Such is the exception, historically well recognized, of the right to seize without warrant goods and papers on ships or other moving vehicles. Another exception is the right of searching the person upon arrest. Whether that right is a surviving incident of the historic role of the "hue and cry" in early Anglo-Saxon law, see *People* v. *Chiagles,* 237 N. Y. 193, 196, 142 N. E. 583, or is based on the necessity of depriving the prisoner of potential means of escape, *Closson* v. *Morrison,* 47 N. H. 482, or on preventing the prisoner from destroying evidence otherwise properly subject to seizure, see *Reifsnyder* v. *Lee,* 44 Iowa 101, 103; *Holker* v. *Hennessey,* 141 Mo. 527, 42 S. W. 1090, the right to search a prisoner upon lawful

arrest was early settled in our law.[4]  1 Bishop, *New Criminal Procedure* (4th ed., 1895) §§ 210 *et seq.*

A casual and uncritical application of this right to search the person of the prisoner has led some decisions in the lower federal courts to an unwarranted expansion of this narrow exception, with resulting inroads upon the overriding principle of the prohibition of the Fourth Amendment. Slight extensions from case to case gradually attain a considerable momentum from "judicial sanction of equivocal methods, which, regarded superficially, may seem to escape the challenge of illegality but which, in reality, strike at the substance of the constitutional right."

---

[4] For purposes of present discussion, the validity of the arrest has been assumed. But its legality raises several serious questions. First, it is not clear whether the O. P. A. investigators or the New York City detectives made the arrest. The O. P. A. investigators, of course, have no authorization to make an arrest. Whether the New York detectives are authorized to make arrests for federal offenses is a debatable issue.  See *Gambino* v. *United States*, 275 U. S. 310; *Marsh* v. *United States*, 29 F. 2d 172; § 20 (a) of the Emergency Price Control Act, 56 Stat. 23, 29, 50 U. S. C. App. § 921. Though local law makes provision for punishment of the same acts that are federal offenses in this regard, N. Y. Laws, 1942, c. 544, the arrest was made for a federal and not a state or local offense. If the New York law is controlling as to the validity of the arrest, however, it is within the power of any person to make an arrest for a crime, including a misdemeanor, in his presence. The common law rule restricted arrest without warrant for a misdemeanor to those acts which were breaches of the peace. Here again, there is the issue of whether the petitioner committed any misdemeanor in the presence of those making the arrest at the time the arrest was made. A recent decision by the English Court of Appeal focuses attention on this last question. In *Leachinsky* v. *Christie* (1945), [1946] 1 K. B. 124, at 135, Lord Justice Scott makes clear why the legality of arrest turns on the justification which the arresting officer gives at the time of the arrest: "The law does not allow an arrest in vacuo, or without reason assigned, and the reason assigned must be that the arrest is for the purpose of a prosecution on the self-same charge, as is the justification for the arrest. It follows, and it is a principle lying at the very roots of English free-

*Byars* v. *United States,* 273 U. S. 28, 33–34. In cases dealing with the search of the person,[5] it is natural to speak of the right to search and seize things "in his possession" without strict regard to the ambiguous scope of a man's "possession." From that, opinions slide readily to including the right to search and seize things "within the immediate control" of the arrested person, language appropriate enough when applied to goods which the arrested person was transporting at the time.[6] Taken out of their original context, these phrases are used until they are made to include the entire premises[7] in which

dom, that if a man is arrested on one charge he is entitled to his release the moment the prosecution of that charge is abandoned. The prosecution cannot arrest on one charge, abandon their intention to proceed on that charge and then keep him in cold storage, still nominally on that charge, while they inquire into the possibility of putting forward a different charge. To do that they must first release him: then, when they propose to put forward some other charge, they can make that new charge the occasion of a new arrest." See also *Dumbell* v. *Roberts* (1944), 113 L. J. (K. B.) 185; *People* v. *Marendi,* 213 N. Y. 600, 609 *et seq.,* 107 N. E. 1058. The *Law Quarterly Review,* in commenting on the *Leachinsky* case, pointed out: "An accused person has a right to know what the charge is against him so that, if he elects to speak, he may have a fair and open chance of clearing himself at the earliest moment." 62 L. Q. Rev. at 4. It is to be noted that *Carroll* v. *United States,* 267 U. S. 132, 157, assumes the federal law of arrest to be the same as that of the English.

[5] *E. g., United States* v. *Wilson,* 163 F. 338, 340; *United States* v. *Murphy,* 264 F. 842, 844; *United States* v. *Snyder,* 278 F. 650, 658; *Maynard* v. *United States,* 23 F. 2d 141, 144; *cf. United States* v. *Welsh,* 247 F. 239; *Laughter* v. *United States,* 259 F. 94; *Donegan* v. *United States,* 287 F. 641; *Winkler* v. *United States,* 297 F. 202.

[6] *E. g., Green* v. *United States,* 289 F. 236, 238; *Browne* v. *United States,* 290 F. 870, 875; *Garske* v. *United States,* 1 F. 2d 620; *Kwong How* v. *United States,* 71 F. 2d 71.

[7] *E. g., Swan* v. *United States,* 295 F. 921; *Sayers* v. *United States,* 2 F. 2d 146; *United States* v. *Poller,* 43 F. 2d 911; *United States* v. *71.41 Ounces Gold Filled Scrap,* 94 F. 2d 17; *United States* v. *Feldman,* 104 F. 2d 255; *Matthews* v. *Correa,* 135 F. 2d 534; *United States* v. *Lindenfeld,* 142 F. 2d 829.

the arrest takes place. Another factor enters. This language is sometimes used in cases involving the seizure of items properly subject to seizure because in open view at the time of arrest.[8] But this last confusion is due to a failure to distinguish between the appropriate scope of a search on arrest and the very different problem as to the right of seizure where no search is in question.

It is important to keep clear the distinction between prohibited searches on the one hand and improper seizures on the other. See Mr. Justice Miller, in *Boyd* v. *United States,* 116 U. S. 616, 638, 641. Thus, it is unconstitutional to seize a person's private papers, though the search in which they were recovered was perfectly proper. *E. g., Gouled* v. *United States,* 255 U. S. 298. It is unconstitutional to make an improper search even for articles that are appropriately subject to seizure, *e. g., Amos* v. *United States,* 255 U. S. 313; *Byars* v. *United States,* 273 U. S. 28; *Taylor* v. *United States,* 286 U. S. 1. And a search may be improper because of the object it seeks to uncover, *e. g., Weeks* v. *United States,* 232 U. S. 383, 393–94, or because its scope extends beyond the constitutional bounds, *e. g., Agnello* v. *United States,* 269 U. S. 20.

The course of decisions here has observed these important distinctions. The Court has not been indulgent towards inroads upon the Amendment. Only rarely have its dicta appeared to give undue scope to the right of search on arrest, and *Marron* v. *United States, supra,* is the only decision in which the dicta were reflected in the result. That case has been a source of confusion to the

[8] *E. g., Laney* v. *United States,* 294 F. 412, 416; *United States* v. *Chin On,* 297 F. 531, 533; *United States* v. *Seltzer,* 5 F. 2d 364; *Mattus* v. *United States,* 11 F. 2d 503; *Cheng Wai* v. *United States,* 125 F. 2d 915; *cf. United States* v. *Borkowski,* 268 F. 408; *In re Mobile,* 278 F. 949; *O'Connor* v. *United States,* 281 F. 396; *Vachina* v. *United States,* 283 F. 35; *Furlong* v. *United States,* 10 F. 2d 492; *United States* v. *Fischer,* 38 F. 2d 830.

lower courts. Thus, the Circuit Court of Appeals for the Second Circuit felt that the *Marron* case required it to give a more restricted view to the prohibitions of the Fourth Amendment than that court had expounded in *United States* v. *Kirschenblatt,* 16 F. 2d 202, see *Go-Bart Co.* v. *United States, sub nom., United States* v. *Gowen,* 40 F. 2d 593, only to find itself reversed here, *Go-Bart Co.* v. *United States, supra,* partly on the authority of the *Kirschenblatt* decision which, after the *Marron* case, it thought it must disown. The uncritical application of the right of search on arrest in the *Marron* case has surely been displaced by *Go-Bart Co.* v. *United States, supra,* and even more drastically by *United States* v. *Lefkowitz, supra,* unless one is to infer that an earlier case qualifies later decisions although these later decisions have explicitly confined the earlier case.

In view of the jealousy with which this Court has applied the protection of the Fourth Amendment even where the search purported to take place under a proper warrant and there was the safeguard of judicial process in addition to the expressed judgment of the enforcement officials, see *e. g., Grau* v. *United States,* 287 U. S. 124; *Sgro* v. *United States,* 287 U. S. 206, it was not to be expected that this Court should sanction searches on arrest that can be justified as reasonable only if securing evidence for purposes of the trial is the test of reasonableness for purposes of the Fourth Amendment. Such a view presupposes that the Fourth Amendment is obsolete and makes of the particularity of requirement for search warrants a mocking redundancy.

A final point. In this case the arrest was based on two misdemeanors, the sale of gasoline without the requisite coupons and the sale of gasoline at a price over the O. P. A. ceilings. For neither of these offenses were coupons "instruments of the crime" in any sense in which

that term is properly used.  The exceptional right to search on arrest does not in any event extend to a search for articles necessary to the commission of a crime other than that for which the arrest was made.  The officers could not have made an arrest of Davis for illegal possession of coupons, for which he was later tried, on mere suspicion.  That crime, like the others, was only a misdemeanor, and no arrest can be made for a misdemeanor without a warrant unless it be committed in the presence of officers.  Prior to the search, the officers had no basis for stating that he was committing the crime of illegal possession of the coupons in their presence.

It is too often felt, though not always avowed, that what is called nice observance of these constitutional safeguards makes apprehension and conviction of violators too difficult.  Want of alertness and enterprise on the part of the law enforcers too often is the real obstruction to law enforcement.  The present case affords a good instance.[9]  The situation bears close resemblance to what

_____

[9] The petitioner's gas station was under suspicion for some weeks; yet action was finally taken as described in this opinion.  Petitioner was arrested when he arrived at the gas station for sales above ceiling prices and sales without coupons.  No arraignment was made for these offenses—instead the officers engaged in a search of the premises, which included the essentially forced entry into the petitioner's office.  He was then taken to the local O. P. A. headquarters.  After several hours of questioning at O. P. A. headquarters, Davis was released.  Not until one month later was the petitioner re-arrested and arraigned, and then on a charge entirely different from those on which the original arrest was made.  The Emergency Price Control Act, 56 Stat. 23, 50 U. S. C. App. §§ 901 et seq., made adequate provision for effective enforcement of the statute.  So far as securing documents and papers are concerned, the Administrator is equipped with the subpoena power, § 202 (c), (d), (e); in addition, the Administrator has the power to seek injunction against the acts which the petitioner was accused of committing, § 205 (a); and by appropriate proceedings the Administrator may seek the withdrawal of the license which the petitioner required to operate his business, § 205 (f).

Judge Learned Hand said on another occasion. "We are told that unless such evidence will serve, it will be impossible to suppress an evil of large proportion in the residential part of Brooklyn. Perhaps so; any community must choose between the impairment of its power to punish crime and such evils as arise from its uncontrolled prosecution. But the danger is not certain, for the officers could have applied for a warrant which—as was at least intimated in Taylor v. United States—might then have been valid. It takes time to break up a still and take the parts away; if the attempt were made, it would discover itself immediately. One or more officers could have watched, while the others went to a judge or commissioner, whose action would at least have put a different face upon their subsequent proceedings." *United States* v. *Kaplan*, 89 F. 2d 869, 871.

The Court in this case gives a new label to an old practice and to an old claim by police officials. But it happens that the old practice and the old claim now refurbished in a new verbal dress were the very practice and claim which infringed liberty as conceived by those who framed the Constitution and against which they erected the barriers of the Fourth Amendment. I am constrained to believe that today's decision flows from a view of the Fourth Amendment that is unmindful of the history that begot it and of the purpose for which it was included in the Bill of Rights. And the view of the Amendment which the Court rejects is confirmed by an impressive body of the laws of Congress and of the decisions of this Court. Stern enforcement of the criminal law is the hallmark of a healthy and self-confident society. But in our democracy such enforcement presupposes a moral atmosphere and a reliance upon intelligence whereby the effective administration of justice can be achieved with due regard for those civilized standards in the use of the criminal law which are formulated in our Bill of Rights. If great prin-

ciples sometimes appear as finicky obstructions in bringing a criminal to heel, this admonition of a wise judge gives the final answer: "Such constitutional limitations arise from grievances, real or fancied, which their makers have suffered, and should go pari passu with the supposed evil. They withstand the winds of logic by the depth and toughness of their roots in the past. Nor should we forget that what seems fair enough against a squalid huckster of bad liquor may take on a very different face, if used by a government determined to suppress political opposition under the guise of sedition." Learned Hand, J., in *United States* v. *Kirschenblatt*, 16 F. 2d 202, 203.

## APPENDIX.

SEARCH AND SEIZURE UNDER WARRANT.[*]

A. *Place to be searched.*

Act of July 31, 1789, 1 Stat. 29, 43 (dwelling house, store, building, or other place, by day); Act of August 4, 1790, 1 Stat. 145, 170 (dwelling house, store, building, or other place, by day); Act of March 3, 1791, 1 Stat. 199, 207 (any place, by day); Act of March 2, 1799, 1 Stat. 627, 677–78

---

[*]Congress has passed numerous statutes authorizing inspection of defined premises and seizures without warrants. These are all very particularized acts, relating mostly to the inspection of vessels and vehicles and the seizure of various types of contraband goods. Most of this legislation comes within the exceptions historically recognized at the time of the adoption of the Fourth Amendment as to recapture of stolen goods and search of vehicles and vessels because of their fugitive nature. In such a mass of legislation, it would not be surprising if some of the specific acts fell afoul of the considerations which invalidated the legislation in the *Boyd* case. 116 U. S. 616. What is significant about this legislation is the recognition by Congress of the necessity for specific Congressional authorization even for the search of vessels and other moving vehicles and the seizures of goods technically contraband.

(dwelling house, store, building, or other place, by day);
Act of April 18, 1806, 2 Stat. 379, 380 (dwelling house,
store, building, or other place, by day); Act of March 1,
1809, 2 Stat. 528, 530 (dwelling house, store, building, or
other place); Act of March 3, 1815, 3 Stat. 231, 232 (dwell-
ing house, store, or other building, by day) (no warrant
necessary to search a vehicle); Act of March 3, 1863, 12
Stat. 737, 740 (any place or premises); Act of February
28, 1865, 13 Stat. 441, 442 (buildings near boundary lines);
Act of July 13, 1866, 14 Stat. 98, 152 (any premises); Act
of March 2, 1867, 14 Stat. 546, 547 (any premises); Act
of March 3, 1873, 17 Stat. 598, 599 (no limitation on
scope); Act of April 25, 1882, 22 Stat. 49 (dwelling house,
store-building, or other place, by day); Act of February
10, 1891, 26 Stat. 742, 743 (any house, store, building, boat,
or other place, by day); Act of August 27, 1894, 28 Stat.
509, 549–50 (no limitation on scope); Act of July 24, 1897,
30 Stat. 151, 209 (no limitation on scope); Act of March
3, 1899, 30 Stat. 1253, 1326 (any place in Alaska); Act of
March 3, 1901, 31 Stat. 1189, 1337 (no limitation on
scope); Act of August 5, 1909, 36 Stat. 11, 86 (no limita-
tion on scope); Act of February 14, 1917, 39 Stat. 903,
906–907 (room, house, building, or other place in Alaska);
Act of June 15, 1917, 40 Stat. 217, 228 (by day or, on
certain conditions, night); Act of July 3, 1918, 40 Stat.
755, 756 (any place); Act of October 28, 1919, 41 Stat.
305, 308 (see Act of June 15, 1917, *supra*); Act of Sep-
tember 21, 1922, 42 Stat. 858, 937, 983 (dwelling house by
day, and any store or other place by night or day); Act
of June 7, 1924, 43 Stat. 650, 651 (no limitation on scope);
Act of April 23, 1928, 45 Stat. 448, 449 (no limitation on
scope); Act of February 18, 1929, 45 Stat. 1222, 1225 (see
Act of July 3, 1918, *supra*); Act of June 17, 1930, 46 Stat.
590, 752 (dwelling house, by day, store, or other building
or place); Act of July 2, 1930, 46 Stat. 845, 846 (no limi-

tation on scope); Act of June 15, 1935, 49 Stat. 378, 381 (no limitation on scope); Act of August 27, 1935, 49 Stat. 872, 874–875 (see Act of June 15, 1917, *supra*); Act of April 5, 1938, 52 Stat. 198, 199 (any place in District of Columbia); Act of February 10, 1939, 53 Stat. 1, 436 (no limitation on scope); Act of June 28, 1940, 54 Stat. 670, 671 (by day or, on certain conditions, night); Act of July 1, 1943, 57 Stat. 301, 304 (no limitation on scope); Act of February 26, 1944, 58 Stat. 100, 102 (any person, vessel, or place).

B. *Objects of Search and Seizure.*

Act of July 31, 1789, 1 Stat. 29, 43 (goods subject to duty); Act of August 4, 1790, 1 Stat. 145, 170 (goods subject to duty); Act of March 3, 1791, 1 Stat. 199, 207 (liquors fraudulently deposited, hid, or concealed); Act of March 2, 1799, 1 Stat. 627, 677–78 (goods subject to duty); Act of April 18, 1806, 2 Stat. 379, 380 (articles imported from Great Britain); Act of March 1, 1809, 2 Stat. 528, 530 (articles imported from Great Britain or France); Act of March 3, 1815, 3 Stat. 231, 232 (articles subject to duty); Act of March 3, 1863, 12 Stat. 737, 740 (invoices, papers, and books relating to customs frauds); Act of February 28, 1865, 13 Stat. 441, 442 (dutiable goods); Act of July 13, 1866, 14 Stat. 98, 152 (fraud on the revenue); Act of July 18, 1866, 14 Stat. 178, 187 (fraud on the revenue); Act of March 2, 1867, 14 Stat. 546, 547 (invoices, books, and papers relating to customs frauds); Act of March 3, 1873, 17 Stat. 598, 599 (obscene literature, literature about contraceptives, contraceptive materials); Act of April 25, 1882, 22 Stat. 49 (merchandise on which duty is unpaid); Act of February 10, 1891, 26 Stat. 742, 743 (counterfeit money, coins, etc., and materials used for their manufacture); Act of August 27, 1894, 28 Stat. 509, 549–50 (obscene and immoral literature and articles, lottery tickets);

Act of July 24, 1897, 30 Stat. 151, 209 (obscene and immoral articles and literature, contraceptive and abortive materials, lottery tickets) ; Act of March 3, 1899, 30 Stat. 1253, 1327 (embezzled or stolen property; articles used to commit a felony; property to be used to commit a crime) ; Act of March 3, 1901, 31 Stat. 1189, 1337 (stolen or embezzled goods, counterfeit coins, etc., and materials used to make them, literature of obscene nature, immoral articles, gambling equipment, lottery tickets) ; Act of August 5, 1909, 36 Stat. 11, 86 (obscene or immoral literature, or articles, drugs, objects for abortion, lottery tickets) ; Act of February 14, 1917, 39 Stat. 903, 906–907 (illegally held liquor) ; Act of June 15, 1917, 40 Stat. 217, 228 (stolen or embezzled property; property used in commission of a felony; property used to aid unlawfully a foreign government) ; Act of July 3, 1918, 40 Stat. 755, 756 (illegally secured migratory birds or bird products) ; Act of October 28, 1919, 41 Stat. 305, 308 (alcoholic beverages) ; Act of September 21, 1922, 42 Stat. 858, 937, 983 (obscene literature, drugs for abortion, contraceptive items, lottery tickets; illegal imports) ; Act of June 7, 1924, 43 Stat. 650, 651 (wild life and fish improperly taken from refuge) ; Act of April 23, 1928, 45 Stat. 448, 449 (migratory birds improperly taken from bird refuge) ; Act of February 18, 1929, 45 Stat. 1222, 1225 (see Act of July 3, 1918, *supra*) ; Act of June 17, 1930, 46 Stat. 590, 752 (merchandise on which duties unpaid) ; Act of July 2, 1930, 46 Stat. 845, 846 (illegally caught black bass) ; Act of June 15, 1935, 49 Stat. 378, 381 (illegally captured game and wild life and products thereof shipped in interstate commerce) ; Act of August 27, 1935, 49 Stat. 872, 874–75 (illegally possessed liquor) ; Act of April 5, 1938, 52 Stat. 198, 199 (lottery tickets, gaming devices, books for recording gambling transactions, stolen and embezzled property, forged and counterfeit materials, equipment used for counterfeiting,

obscene and immoral literature and materials); Act of February 10, 1939, 53 Stat. 1, 436 (frauds on the revenue); Act of June 28, 1940, 54 Stat. 670, 671 (subversive materials); Act of July 1, 1943, 57 Stat. 301, 304 (Alaskan game illegally taken and equipment used to make captures); Act of February 26, 1944, 58 Stat. 100, 102 (illegally taken seal products and equipment used to aid in the takings).

C. *Requirements for issuance of warrant.*

Act of July 31, 1789, 1 Stat. 29, 43 (suspicion of concealment of goods, application on oath or affirmation before justice of the peace); Act of August 4, 1790, 1 Stat. 145, 170 (suspicion of concealment, application on oath or affirmation before justice of the peace); Act of March 3, 1791, 1 Stat. 199, 207 (oath or affirmation, establishing grounds for reasonable cause for suspicion, before U. S. judge or justice of the peace); Act of March 2, 1799, 1 Stat. 627, 677–78 (suspicion of concealment, application, on oath, to justice of the peace); Act of April 18, 1806, 2 Stat. 379, 380 (same); Act of March 1, 1809, 2 Stat. 528, 530 (same); Act of March 3, 1815, 3 Stat. 231, 232 (suspicion of concealment, proper application, on oath, to any judge or justice of the peace); Act of March 3, 1863, 12 Stat. 737, 740 (affidavit establishing fraud or attempted fraud to satisfaction of U. S. district judge); Act of February 28, 1865, 13 Stat. 441, 442 (oath showing belief or reason to believe that smuggled goods are kept on the premises); Act of July 13, 1866, 14 Stat. 98, 152 (oath in writing before U. S. circuit or district judge or commissioner, setting forth belief or reason to believe fraud on revenue committed on premises); Act of July 18, 1866, 14 Stat. 178, 187 (may be issued by any district judge); Act of March 2, 1867, 14 Stat. 546, 547 (complaint and affidavit, to satisfaction of U. S. district judge, of customs fraud); Act of March 3, 1873, 17 Stat. 598, 599 (written complaint of violation of statute, before U. S. district or circuit judge,

setting forth belief or basis for belief, to satisfaction of judge, supported by oath or affirmation); Act of April 25, 1882, 22 Stat. 49 (proper application, on oath, to justice of the peace, district judge of cities, police justice, or U. S. district or circuit judge); Act of February 10, 1891, 26 Stat. 742, 743 (proper oath or affirmation, showing probable cause for belief that statute is being violated); Act of August 27, 1894, 28 Stat. 509, 549-50 (complaint in writing, founded on knowledge or belief, setting forth grounds for belief, supported by oath or affirmation, to the satisfaction of U. S. district or circuit judge); Act of July 24, 1897, 30 Stat. 151, 209 (complaint in writing of violation of act, to satisfaction of U. S. district or circuit judge, founded on knowledge or belief, setting forth basis for belief, and supported by oath or affirmation); Act of March 3, 1899, 30 Stat. 1253, 1327 (probable cause, shown by affidavit, naming or describing person, describing the property and the place to be searched, to the satisfaction of an examining magistrate); Act of March 3, 1901, 31 Stat. 1189, 1337 (complaint, under oath, before police court or justice of the peace, setting forth belief and cause for belief of concealment in any place of specified articles, describing the place to be searched and the property to be seized); Act of August 5, 1909, 36 Stat. 11, 86 (complaint in writing before U. S. circuit or district judge of violation of act, to the satisfaction of the judge, setting forth grounds for belief and supported by oath or affirmation, a warrant may issue "conformably to the Constitution"); Act of February 14, 1917, 39 Stat. 903, 906-907 (charge, on oath or affirmation, before Alaskan district attorney, of violation of prohibition laws; place where violation occurred to be specifically described); Act of June 15, 1917, 40 Stat. 217, 228-29 (affidavits or depositions, setting forth facts establishing grounds or probable cause for belief that grounds exist, before U. S. or State judge, or U. S. commis-

sioner); Act of July 3, 1918, 40 Stat. 755, 756 (proper oath or affirmation before U. S. judge or commissioner, showing probable cause of violation of the statute); Act of October 28, 1919, 41 Stat. 305, 308 (see Act of June 15, 1917, *supra*); Act of September 21, 1922, 42 Stat. 858, 937, 983 (complaint in writing before U. S. district judge, alleging violation of statute, founded on probable cause and supported by oath or affirmation and conformable to the requirements of the Constitution; cause to suspect presence of dutiable goods, application under oath before justice of the peace, local, State, or federal judges, or U. S. commissioner); Act of June 7, 1924, 43 Stat. 650, 651 (proper oath or affirmation before U. S. judge or commissioner showing probable cause of violation); Act of April 23, 1928, 45 Stat. 448, 449 (proper oath or affirmation, before U. S. judge or commissioner, showing probable cause of violation of statute); Act of February 18, 1929, 45 Stat. 1222, 1225 (see Act of July 3, 1918, *supra*); Act of June 17, 1930, 46 Stat. 590, 752 (suspicion of concealment of dutiable goods, application under oath to any justice of the peace, local, State, or federal judge, or U. S. commissioner); Act of July 2, 1930, 46 Stat. 845, 846 (proper oath or affirmation before U. S. judge or commissioner establishing probable cause that statute was violated); Act of June 15, 1935, 49 Stat. 378, 381 (proper oath or affirmation before U. S. judge or commissioner establishing probable cause that statute violated); Act of August 27, 1935, 49 Stat. 872, 874-75 (see Act of June 15, 1917, *supra*); Act of April 5, 1938, 52 Stat. 198, 199 (complaint under oath, before the police court for the District of Columbia, or U. S. commissioner, setting forth belief or cause for belief, particularly describing the place to be searched, the articles to be seized); Act of February 10, 1939, 53 Stat. 1, 436 (oath in writing before U. S. district judge or commissioner, setting forth reason to believe that

fraud on revenue committed or being committed) ; Act of June 28, 1940, 54 Stat. 670, 671 (see Act of June 15, 1917, *supra*) ; Act of July 1, 1943, 57 Stat. 301, 304 (proper oath or affirmation, showing probable cause of violation of Alaskan game laws, before U. S. judge or commissioner) ; Act of February 26, 1944, 58 Stat. 100, 102 (oath or affirmation before U. S. judge or commissioner, showing probable cause of violation of statute).

MR. JUSTICE RUTLEDGE, dissenting.

I am substantially in accord with the views expressed by MR. JUSTICE FRANKFURTER in his exhaustive opinion as to the controlling principles which should govern in the disposition of this case. Perhaps it should be added that the evidence does not clearly show that the officer who flashed the light into the window was in fact attempting to open it by force or to do more than observe the interior. But the situation was such that his action clearly created in Davis' mind the impression that he either was entering by force or intended to do so. It therefore must be taken, I think, that Davis' so-called consent was induced by this apparent compulsion, the very kind of thing the Fourth Amendment was designed to prevent. There was no such consent as would legalize the entry and search.

Moreover, whatever may be the scope of search incident to lawful arrest for a misdemeanor, I know of no decision which goes so far as to rule that this right of search extends to breaking and entering locked premises by force. That was not done here. But the search followed on consent given in the reasonable belief that it was necessary to avoid the breaking and entry. I think it was therefore in no better case legally than if in fact the breaking and forceable entry had occurred. The search was justified neither by consent nor by the doctrine of reasonable search as incident to a lawful arrest.