In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-05-00165-CR


______________________________




SHELDON ROBERTS, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 283rd Judicial District Court


Dallas County, Texas


Trial Court No. F04-73256-MT




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Chief Justice Morriss



MEMORANDUM OPINION



 Virginia Ramirez was eight to nine weeks pregnant when, in the early morning hours of
December 19, 2003, armed assailants smashed in the door to the Dallas, Texas, apartment she and
a few companions occupied. The assailants immediately unleashed a hail of bullets; Ramirez and
her unborn child died, as well as two of Ramirez's companions, Heath Laury and Jessica Thompson. 
 A jury convicted Brandon Shaw (1) and Sheldon Roberts of murder in the deaths of Ramirez
and her unborn child. (2) See Tex. Penal Code Ann. § 19.03 (Vernon Supp. 2006). When the State
did not seek the death penalty, Roberts' and Shaw's sentences were automatically fixed at
imprisonment for life. See Tex. Penal Code Ann. § 12.31(a) (Vernon Supp. 2006). Roberts
appeals his conviction, raising issues we have combined for the purposes of this opinion. We affirm
Roberts' conviction and sentence because we hold that (1) the trial court did not err by denying
Roberts' evidence-suppression motion, (2) the evidence is legally and factually sufficient to support
the verdict, and (3) the charge did not contain a material variance or lack a required culpable mental
state. (3)

(1) The Trial Court Did Not Err by Denying Roberts' Evidence-Suppression Motion

 Roberts contends the trial court erred by overruling his pretrial motion to suppress evidence. 
After police arrested Roberts at 2805 Reagan Street, apartment 105, in Dallas, Texas, they searched
that apartment for evidence related to a murder charge--otherwise unrelated to this case--for which
Roberts had then been arrested. Before searching the apartment, the police obtained consent from
the apartment's leaseholder, Stephanie Kingree. (4) According to Kingree, Roberts was merely an
occasional overnight guest at apartment 105; he did not pay rent or utilities for the unit. Roberts now
complains the police were without lawful authority to search that apartment because they lacked a
search warrant, lacked probable cause to search, and did not obtain proper consent to search that
location. Therefore, Roberts contends, the evidence was obtained as a result of a warrantless search
in violation of the Fourth Amendment and should have been excluded. 

 (a) The Standard of Review and Applicable Law

 A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. 
Osburn v. State, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002). A trial court abuses its discretion if
it acts outside the zone of reasonable disagreement. Burden v. State, 55 S.W.3d 608, 615 (Tex.
Crim. App. 2001). If the trial court's ruling regarding the admission or exclusion of evidence is
supported by the record and is correct under any theory of law applicable to the case, the reviewing
court should uphold that ruling. Brito Carrasco v. State, 154 S.W.3d 127, 129 (Tex. Crim. App.
2005).

 The Fourth and Fourteenth Amendments protect citizens and their property from
unreasonable searches and seizures by the police. "Unreasonable" searches and seizures are more
commonly defined as those that are conducted not pursuant to a valid search warrant or those that
are accomplished when one of the few exceptions to the Fourth Amendment does not excuse the
warrant requirement. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Stated differently,
a warrantless entry into, and search of, a person's home is generally unreasonable per se and thereby
violates the Fourth and Fourteenth Amendments unless an exception applies. Georgia v. Randolph,
547 U.S. 103 (2006). A trial court errs when it admits evidence at trial that has been obtained in
violation of the Fourth and Fourteenth Amendments' protections against unreasonable searches. 
Bumper v. North Carolina, 391 U.S. 543, 548-50 (1968).

 "The Fourth Amendment recognizes a valid warrantless entry and search of premises when
police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share,
authority over the area in common with a co-occupant who later objects to the use of evidence so
obtained." Randolph, 547 U.S. at 217. Consent to search is one of the well-established exceptions
to the Fourth Amendment's warrant requirement. Schneckloth, 412 U.S. at 222 (citing Katz v. United
States, 389 U.S. 347, 358 (1967)); see also Randolph, 547 U.S. at 219; Montanez v. State, 195
S.W.3d 101, 105 (Tex. Crim. App. 2006) (citing Carmouche v. State, 10 S.W.3d 323, 331 (Tex.
Crim. App. 2000)). When the police obtain permission from the owner of the particular property to
be searched, they need not further obtain a search warrant from a neutral magistrate. Schneckloth,
412 U.S. at 222; Davis v. United States, 328 U.S. 582, 593-94 (1946). The person from whom
consent is obtained "might be the householder against whom evidence is sought . . . or a fellow
occupant who shares common authority over property, when the suspect is absent, . . . and the
exception for consent extends even to entries and searches with the permission of a co-occupant
whom  the  police  reasonably,  but  erroneously,  believe  to  possess  shared  authority  as  an
occupant . . . ." Randolph, 547 U.S. at 219 (citations omitted). 

 In Texas, "the State must prove by clear and convincing evidence that consent was
voluntarily given." Montanez v. State, 195 S.W.3d 101, 105 (Tex. Crim. App. 2006) (referencing
Tex. Const. art. I, § 9, and citing Carmouche, 10 S.W.3d at 331); see also Bumper, 391 U.S. at
549-50 (State may not claim consent if obtained via coercion); Schneckloth, 412 U.S. at 222 (if State
seeks to rely on consent to justify lawfulness of search, State "has the burden of proving that the
consent was, in fact, freely and voluntarily given").

 In this appeal, Roberts does not challenge the voluntariness of Kingree's consent; he contends
only that Kingree lacked authority to provide consent. "[T]he Fourth Amendment allows persons
with common authority over property to consent to the search of the property." Patrick v. State, 906
S.W.2d 481, 490 (Tex. Crim. App. 1995) (citing United States v. Matlock, 415 U.S. 164 (1974)). 
"'Common authority' is mutual use of the property by persons generally having joint access or control
for most purposes." Id. (quoting Illinois v. Rodriguez, 497 U.S. 177, 179 (1990)). In Patrick, the
appellant had asserted error in the trial court finding that the woman who gave police permission to
search the apartment had authority to grant such consent. Id. The Texas Court of Criminal Appeals
noted this woman was a signatory to the original rental agreement. Id. There was also evidence she
paid half the utility bills for that location. Id. Based on this evidence, and in the absence of any
evidence that this woman had somehow relinquished her common authority over the residence, the
court concluded the trial court had not erred by overruling the defendant's motion to suppress, as the
woman had authority to consent to the search. Id.

 (b) The Search-Viability Evidence

 In the case now on appeal, Dallas police officer John Davidson testified at the suppression
hearing that, on March 30, 2004, he and several uniformed officers went to an apartment building
located at 2805 Reagan Street in Dallas. The officers went to apartment 205 and were looking for
Roberts because they had learned he might be there with his girlfriend, Ashley Mack. Roberts and
Ashley were not there, but Kingree, Ashley's mother, was home. Kingree informed the officers that
Roberts was probably in apartment 105, which was located one floor below. Davidson testified that
Kingree also told him that she was a signatory to the lease for apartment 105 and that she paid the
rent for that unit. Kingree later gave the officers verbal and written consent to enter and "conduct
a  complete  search"  of  apartment  105.  After  obtaining  this  consent,  the  officers  searched
apartment 105. Therein, the officers located four shoe boxes during the search, one of which
contained two live 7.62x39 mm bullets manufactured by Wolf Bullets. 

 Kingree also testified at the suppression hearing. She told the trial court that she had
willingly given permission to the officers to search apartment 105; that she, not her daughter Ashley,
signed the lease to that apartment and was renting the apartment on behalf of Ashley and Ashley's
roommates--not Roberts--and that, though she respected her daughter's privacy, she believed she
had the right to come and go inside that apartment at any time. And, as the State's brief on appeal
correctly notes, Kingree did not testify that she had, at any point before consenting to the search,
somehow relinquished her common authority over apartment 105. 

 Whitney Mack, Ashley's sister, testified Roberts had been Ashley's overnight guest on the
evening before he was arrested at the apartment. (5) But Whitney also testified that Roberts did not live
there, a statement Kingree also made during her testimony. And Kingree testified Roberts did not
help pay the rent or bills associated with apartment 105; these bills were apparently split between
another person and Kingree.

 (c) Conclusion on Suppression Issue

 The trial court concluded the police could have reasonably believed that Kingree, as someone
who said she signed the rental agreement, as someone who paid rent, and as someone who claimed
unfettered access to the apartment, had both actual and apparent authority to consent to the search. 
The trial court also concluded Kingree had both actual and apparent authority to provide the officers
with consent to search. The trial court's ruling--that the search was authorized by the properly
obtained consent of an appropriate party--is clearly supported by the evidence in the record before
us. No abuse of discretion has been shown. We overrule this point of error.

(2) The Evidence Is Legally and Factually Sufficient to Support the Verdict

 Roberts also challenges generally the legal and factual sufficiency of the evidence to support
his conviction. He contends nothing in the way of DNA or other scientific evidence links him to the
commission of the murders. He also asserts that none of the witnesses at trial identified him as being
present when the victims were killed. He asks us to reverse his conviction and either remand the
case for a new trial or render a judgment of acquittal. 

 (a) Standards of Review

 In reviewing the legal sufficiency of the evidence, the reviewing court employs the standards
set forth in Jackson v. Virginia, 443 U.S. 307, 319 (1979). This calls on the court to examine the
relevant evidence in the light most favorable to the verdict and determine whether any rational trier
of fact could have found the essential elements of the crime beyond a reasonable doubt. See Tello
v. State, 180 S.W.3d 150, 150 n.1 (Tex. Crim. App. 2005) (citing Jackson, 443 U.S. at 319). 

 When reviewing a challenge to the factual sufficiency of the evidence supporting the
conviction, the reviewing court must determine whether, considering all the evidence in a neutral
light, the great weight and preponderance of the evidence contradicts the jury's verdict. Watson v.
State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006). If the evidence is factually insufficient, then
the appellate court must reverse the trial court's judgment and remand the case for a new trial. Id.
at 405 & 417; Clewis v. State, 922 S.W.2d 126, 135 (Tex. Crim. App. 1996).

 (b) The Indictment and the State's Evidence

 The indictment in this case alleged Roberts did 

intentionally and knowingly cause the death of . . . Virginia Ramirez, by shooting
Virginia Ramirez with a firearm, a deadly weapon, and during the same criminal
transaction said defendant did then and there intentionally and knowingly cause the
death of another individual, to wit: an unborn child of Virginia Ramirez, by shooting
Virginia  Ramirez  while  said  unborn  child  was  in  gestation  of  said  Virginia
Ramirez . . . .


The jury charge authorized Roberts' conviction as either a principal or as a party to the offense. 
Under our law, a person is criminally culpable as a party if, with intent to promote or assist the
commission of the offense, the person solicits, encourages, aids, directs, or attempts to aid, another
person in commission of the offense. Tex. Penal Code Ann. § 7.02(a)(2) (Vernon 2003). The
evidence is sufficient to sustain a conviction under the law of parties if that evidence shows the
defendant was physically present during the commission of the offense and further shows the
defendant encouraged or aided the crime's commission by either words, agreement, or other
affirmative and supportive conduct. King v. State, 29 S.W.3d 556, 564 (Tex. Crim. App. 2000);
Ransom v. State, 920 S.W.2d 288, 301 (Tex. Crim. App. 1994).

 We now turn to a review of the relevant evidence.

 (1) Jonie McClain

 Jonie McClain, the deputy chief medical examiner for Dallas County, testified that Ramirez
died as a result of being shot three times, that Thompson died as a result of being shot five times, and
that Laury died as a result of being shot twelve separate times. (6) What was unique about Laury's
injuries was that most of the wounds were caused by shots fired to Laury's face--specifically, to his
jaw and cheekbone. McClain also testified that Ramirez was eight or nine weeks pregnant, that her
unborn child had been alive when Ramirez was shot, and that killing Ramirez directly caused her
unborn child's death. On cross-examination, McClain admitted that it was impossible for someone
to look at Ramirez's outward appearance at the time of her death and be able to tell she was then
pregnant. McClain confirmed, however, that Ramirez was pregnant at the time of her death, that the
unborn child was alive until the mother died, and that the unborn child also died in utero as a result
of Ramirez's death. 

 (2) Robert Nero

 Robert Nero testified that, in the evening hours of December 18, 2003, Roberts was visiting
with Nero at the latter's house when they received a visit from Timothy Green. The three men visited
for a few minutes, after which Roberts and Green left. Roberts informed Nero that he would return
later. 

 When Roberts returned after midnight, he was accompanied by Green. Green and Roberts
had with them a rifle wrapped inside a "red, white, and blue" jacket with a "professional logo" on
it. Nero recognized the rifle, which he described as being an "SK with a clip on it." Nero had seen
Roberts carrying the gun on a previous occasion. Roberts handed the rifle to Green, but kept the
jacket in which the gun had been wrapped. Green then left Nero's house in a light-colored four-door
car, inside of which Nero saw Jackie Tubbs, Shaw, and possibly two more people.

 Later that morning, Roberts admitted to Nero that Shaw had "got[ten] a little bit of blood on
[Roberts'] coat." Nero testified that Roberts further admitted to having gone with Green and others
to some apartments, and "that they went inside the apartments and shot a couple of people that was
[sic] in the apartment." Nero told the jury that Roberts had identified the victims as "some males and
a female." According to Nero, Roberts knew that one of the males had been shot in the "face area." 
But Nero also testified that Roberts had said he himself had not shot anyone. Additionally, Nero told
the jury that Roberts said someone had been able to make it out of the apartment alive. Nero then
said he saw Roberts take the jacket into the backyard, after which the jacket was burned in a barrel. 

 On cross-examination, Nero admitted that he himself had recently "caught" a murder charge. 
Roberts' cross-examination of Nero also made clear that, by testifying against Roberts in this case,
Nero hoped to get a plea offer of community supervision--even though Nero was adamant that he
was "not guilty" of the murder charge. Nero also admitted that his only source of income came from
the sale of illegal narcotics and that he was serving a probated sentence for a different felony crime. 
 (3) Semaj Jackson

 At the time of Roberts' trial in this case, Semaj Jackson himself faced a murder charge, along
with codefendants Nero and Roberts. Jackson testified that, on December 19, 2003, he went to an
area in northern Dallas to pick up Roberts. After the two returned to Nero's house, Roberts admitted
to both Jackson and Nero that he had been with Shaw and Green on the preceding evening. Roberts
reportedly admitted that he, Shaw, and Green had broken into Laury's apartment; Shaw then shot
Laury in the face with an "SK" assault rifle. According to Jackson, Roberts never admitted to having
gone all the way inside the apartment; instead, Jackson testified that Roberts said he had just waited
at the front door of the apartment. 

 Later that day, Jackson took Roberts to the house of the latter's grandmother, where Roberts
then retrieved a coat described as bearing an "Atlanta Braves baseball team logo." (7) It was the same
jacket that Jackson had seen Roberts wearing the previous night. When Jackson and Roberts
returned home, Roberts reportedly went to the backyard, "lit a barrel on fire, and they threw the coat
in [the barrel]." Jackson had seen blood spatters on that same jacket earlier that day. 

 Finally, Jackson told the jury that he had previously seen Roberts in possession of an assault
rifle similar to an "AK" or an "SK," but had not seen him in possession of such a weapon since
Roberts was charged with these murders. 

 (4) Tacueescie Gassaway

 At the time she testified at Roberts' trial, Tacueescie Gassaway was confined by the Dallas
County Sheriff. Gassaway told the jury that Roberts and Shaw were close friends. Gassaway
admitted she had heard rumors that Shaw and some others had murdered Laury, Thompson, and
Ramirez. Gassaway had also previously given police a statement in which she had heard that Shaw
had admitted being the person who killed Laury and that Laury was killed in retaliation for an earlier
shooting with which Laury was believed to have been involved. 

 (5) Rick Berry

 Rick Berry was one of the first Dallas police officers to arrive at the murder scene on the
morning of December 19, 2003. Berry described the murder scene as located in a high crime area
of Dallas. Berry talked to one eyewitness, Curlie Arnick, who had seen several people fleeing
Laury's apartment immediately following the shootings. Berry said he was told by Arnick that one
of those people fleeing was dressed in a "red and blue" sports jacket similar in appearance to a
Philadelphia 76ers basketball team jacket. (8) Through his investigation, Berry came to suspect that
Laury, Thompson, and Ramirez were killed in retaliation for a shooting that had occurred earlier that
night at the same apartment complex. 

 Berry followed several leads concerning various suspects. Eventually, Berry was able to
exclude several suspects, including DeMarcus Day and Kevin Kyle. The officer was, however,
unable to find any evidence to either inculpate or exonerate several suspects, including Jackie Tubbs,
Gary Shaw, Jerome Walker, Timothy Green, Semaj Jackson, and Willie Reed. 

 But Berry did collect evidence linking Roberts to the murders in this case. When Berry
interviewed both Nero and Jackson, they told him of Roberts' presence at the apartment when the
killings took place. 

 (6) David Spence, Ismael Parra, and Kenneth Balagot

 David Spence supervises the trace evidence section at the Southwestern Institute for Forensic
Sciences (SWIFS). His position requires him to analyze, as well as supervise the analysis of,
different types of physical evidence, including gunshot residue, hair samples, unknown fibers, glass
fragments, paint samples, and debris from fires. Spence conducted several tests on evidence
submitted in connection with this case. Spence did not testify that any of his scientific tests caused
him to identify Roberts as either the killer of, or as a party to the killings of, the victims in this case.

 The testimony of Ismael Parra, another SWIFS worker, similarly failed to provide any
suggestion of Roberts' culpability.

 Kenneth Balagot, a forensic biologist at SWIFS, tested a cigarette butt that was found at the
crime scene. Through DNA testing, Balagot was able to exclude Roberts as a match to the DNA
found on the cigarette. However, there was other evidence found at the crime scene with DNA
material, and Balagot was unable to exclude Roberts from the list of potential contributors of the
DNA found on those other items. 

 (7) Curlie Arnick

 Curlie Arnick lived in an apartment near the crime scene at the time of the murders. Shortly
after the shooting occurred, Arnick saw several people running out of Laury's apartment; all those
fleeing were wearing "hoodie" sweatshirts, except for one person. That person was wearing a
distinctive "red" jacket that appeared to also have a hood. Arnick noticed that the "red" jacket had
a logo on it, but he could not identify the logo or sports team pictured on the jacket. 

 Earlier in the evening, before the shootings occurred, a man dressed in a "red" jacket had
come to Arnick's apartment. Arnick no longer remembers what that earlier visitor looked like. He
does, however, believe that the earlier visitor's "red" jacket bore at least a strong resemblance to the
"red" jacket Arnick later saw being worn by one of the people seen fleeing the murder scene. 

 (8) James Vineyard

 James Vineyard recently retired from the Dallas Police Department after twenty-seven years
of service. Vineyard arrived at the murder scene December 19, 2003. Vineyard located several
victims inside the apartment. He found inside the apartment evidence of the discharge of both a
shotgun and an automatic weapon such as a Russian-made AK-47 or a Chinese-made SKS. Vineyard
located evidence that two other types of guns had been used during the murders: a .40 caliber gun
and a .45 caliber gun. Vineyard also collected fingerprint evidence at the crime scene. None of the
fingerprints Vineyard was able to collect were later determined to match Roberts' fingerprints. 


 (9) Tim Taylor

 Tim Taylor, an intensive care and charge nurse at Dallas Methodist Medical Center, testified
that he had tended to a patient named Archie "Fifty" Shaw on the evening of December 18, 2003. 
Archie Shaw had been shot in his jaw with a gun. While Taylor attempted to treat Archie Shaw,
several visitors became agitated and started causing a disruption. When Taylor heard one of the
visitors say, "That they were going to take care of things," Taylor became so alarmed that he
instituted a "lock down" of the intensive care unit and began removing all visitors and nonessential
personnel out of concern for patient and employee safety. 

 (10) Royale Bolden

 Royale Bolden had been inside the same apartment as the victims when they were shot;
Bolden, however, escaped harm by hiding inside a closet and remaining quiet until all the shooting
had stopped and the shooters had left. Bolden did not see anything of the shooters, nor could he
identify any of their voices. 

 (11) Corey Smith

 Like Bolden, Corey Smith was also inside Laury's apartment when the victims were shot, and
Smith escaped harm by hiding inside a closet once the shooting began. Smith, too, was unable to
identify any of the voices he heard during the shooting. And, in court, Smith could not identify
Roberts as someone he had ever seen before. 


 (12) Bradlee Bowie

 Bradlee Bowie had also been inside Laury's apartment just before the shooting began. 
However, when Bowie heard someone kick in the front door, he ran into Virginia Ramirez's bedroom
and jumped out the window. As Bowie made his escape, he heard a voice he recognized as
belonging to Roberts' codefendant, Shaw. Bowie did not testify that he had seen Roberts during the
murders, nor did Bowie tell the jury he recognized Roberts' voice among the assailants.

 (13) Whitney Mack

 Whitney Mack is the sister of Roberts' girlfriend, Ashley. Roberts sometimes stayed as an
overnight guest at Ashley's apartment. Whitney testified that she had never seen Roberts with a gun
or any bullets, nor had she ever seen Roberts hanging out with Shaw. 

 When the police arrested Roberts, they did so at Ashley's apartment. When they later
searched the apartment, the police found a shoe box containing several unspent AK-47 bullets
(specifically, 7.62x39 mm Wolf Bullets). Whitney testified that the bullets belonged to neither her
nor Roberts. 

 (c) Analysis of Sufficiency Challenges

 Using the proper standards of review and after considering all the evidence--especially
(1) Gassaway's testimony that Shaw had admitted killing Laury, (2) Nero's testimony that Roberts
had admitted going with the others to Laury's apartment and participating in the murders, (3) Nero's
testimony that Roberts had one of the possible murder weapons immediately following the time the
crime was committed, (4) Nero's testimony that he had seen Roberts with a bloody jacket just a few
hours after the murders, (5) Jackson's testimony that he saw Roberts with a professional sports team
jacket that had blood stains on it, (6) Jackson's testimony that he saw Roberts burn that jacket in a
barrel shortly after the murders occurred, (7) Jackson's testimony that Roberts admitted at least a
limited involvement in the initial burglary that led to the murders, and (8) the fact that Roberts was
arrested at a location where the police also found bullets that were of the same type and make as
some of those used in the murders--we cannot say that the evidence in this case is either legally or
factually insufficient to support the jury's verdict. There was evidence to show, at a minimum, that
Roberts was with the ones who did the shooting, that Roberts helped the shooters break into Laury's
apartment, and that Roberts helped conceal and destroy evidence after the fact. We conclude there
were enough pieces of direct and circumstantial evidence which the jury could use to link Roberts
as a party to the commission of these murders. We, therefore, overrule Roberts' general challenges
to the legal and factual sufficiency of the evidence. (9)


(3) The Charge Did Not Contain a Material Variance or Lack a Required Culpable Mental State

 Roberts also contends there is a material variance between the grand jury's indictment and
the proof offered at trial. Finally, Roberts contends the jury's charge is fatally flawed in that it did
not require the jury to find that Roberts had the requisite culpable mental state with respect to one
of the victims, Ramirez's unborn child. 

 "A 'variance' occurs when there is a discrepancy between the allegations in the charging
instrument and the proof at trial." Hart v. State, 173 S.W.3d 131, 144 (Tex. App.--Texarkana 2005,
no pet.) (quoting Gollihar v. State, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001)). "The widely
accepted rule, regardless of whether viewing variance as a sufficiency of the evidence problem or
as a notice-related problem, is a variance that is not prejudicial to a defendant's 'substantial rights'
is immaterial." Id. (quoting Gollihar, 46 S.W.3d at 257-58; referencing Rojas v. State, 986 S.W.2d
241, 246 (Tex. Crim. App. 1998)).

 To determine whether a defendant's "substantial rights" have been prejudiced, we
must consider two questions: whether the indictment, as written, informed the
defendant of the charge against her or him sufficiently to allow such defendant to
prepare an adequate defense at trial, and whether prosecution under the deficiently
drafted indictment would subject the defendant to the risk of being prosecuted later
for the same crime.


Id. (citing Gollihar, 46 S.W.3d at 248; Brown v. State, 159 S.W.3d 703, 709 (Tex. App.--Texarkana
2004, pet. ref'd)).

 The indictment in this case alleged Roberts, by shooting Ramirez with a firearm, also
"intentionally and knowingly cause[d] the death of another individual, to wit: an unborn child of
Virginia Ramirez, by shooting Virginia Ramirez while said unborn child was in gestation . . . ." The
trial court's jury instructions defined the applicable culpable mental states and further informed the
jury that "[a] person is nevertheless criminally responsible for causing a result if the only difference
between what actually occurred and what he desired, contemplated or risked is that a different person
was injured, harmed, or otherwise affected." The trial court's charge then authorized the jury to
convict Roberts of capital murder if the jury found that Roberts (acting as a principal or as a party)
"intentionally or knowingly caused the death of Virginia Ramirez . . . and during the same criminal
transaction, while desiring or contemplating the death of Virginia Ramirez, did cause the death of
Virginia Ramirez's unborn child, an individual, while said unborn child was in gestation of said
Ramirez . . . ." 

 Roberts correctly points out that there is no evidence anywhere in the voluminous trial record
that Roberts or anyone else knew Ramirez was pregnant at the time of her death. The State, in
furtherance of its duty of candor to this Court, agrees there is no such evidence in the record. See
Tex.  Disciplinary  R.  Prof'l  Conduct  3.09(d),  reprinted  in  Tex.  Gov't  Code  Ann.,  tit.  2,
subtit. G app. A (Vernon 2005) (Tex. State Bar R. art. X, § 9). However, the State also correctly
points out that such evidence was not required given the allegation contained in the indictment and
the evidence offered at trial. 

 "A person is nevertheless criminally responsible for causing a result if the only difference
between what actually occurred and what he desired, contemplated, or risked is that . . . a different
person or property was injured, harmed, or otherwise affected." Tex. Penal Code Ann. § 6.04(b)(2)
(Vernon 2003). This concept is typically referred to as the doctrine of "transferred intent." The issue
of transferred intent "is raised when there is evidence that a defendant, with the required culpable
mental state, intends to injure or harm a specific person but injures or harms a different person or
both." Trevino v. State, No. 13-02-353-CR, 2006 Tex. App. LEXIS 4938, at *16-17 (Tex.
App.--Corpus Christi June 8, 2006, pet. ref'd) (citing Manrique v. State, 994 S.W.2d 640, 647 (Tex.
Crim. App. 1999) (McCormick, P.J., concurring)); see Dowden v. State, 758 S.W.2d 264, 272-73
(Tex. Crim. App. 1988) (transferred intent supported conviction where defendant initiated shoot out
in police station that resulted in friendly fire death of different officer); Pettigrew v. State, 999
S.W.2d 810, 812-13 (Tex. App.--Tyler 1999, no pet.) (by shooting into group of people, defendant
intentionally engaged in act dangerous to life that caused death of nearby innocent bystander; murder
conviction upheld).

 In Trevino, the defendant had been convicted of murder and aggravated assault. The
Thirteenth Court of Appeals held the evidence was factually and legally sufficient to support the
convictions. That court theorized that the jury could have found that Trevino could have formed
separate intents to kill the murder victim and to wound the assault victim. The court opined that,
alternatively, Trevino merely intended to kill or harm one of the victims, but in so doing had
unintentionally killed the other victim and the doctrine of transferred intent authorized the jury to
convict Trevino without requiring proof that Trevino intended the harm specifically toward both
victims. Trevino, 2006 Tex. App. LEXIS 4938, at *6. 

 In this case, while none of the shooters may have known of Ramirez's pregnancy or may have
formed the intent to specifically kill Ramirez's unborn child, there is ample evidence that these
assailants did intend to kill Ramirez. Therefore, Roberts may be held criminally responsible under
the doctrine of transferred intent, as codified by our law, for all direct consequences of those
actions--including the death of Ramirez's unborn child. Accordingly, we overrule Roberts' final
points of error.

 For the reasons stated, we affirm the trial court's judgment.



 Josh R. Morriss, III

 Chief Justice


Date Submitted: February 13, 2007

Date Decided: June 14, 2007


Do Not Publish
1. Brandon Shaw will be called Shaw in this opinion. Other individuals with the same last
name will be referenced by their full names.
2. Emmanuel Dornail Rogers was also tried and convicted for the murders. See Rogers v.
State, No. 05-05-00283-CR, 2006 Tex. App. LEXIS 1609 (Tex. App.--Dallas Mar. 1, 2006, no pet.)
(not designated for publication). 
3. Roberts' companion appeal to this Court concerns the murders of Laury and Thompson. 
Rogers v. State, cause number 06-05-00164-CR.
4. There was also evidence Kingree actually paid the rent for apartment 105. 
5. Whitney lived in the apartment with Ashley and a third person, Lakeitha Leftridge. 
6. McClain conducted Thompson's autopsy. Dr. Christopher Young and Dr. Brad Butler,
respectively, performed the autopsies of Ramirez and Laury. The doctors' autopsy reports
collectively conclude the victims in this case died as a result of sustaining multiple gunshot wounds. 
7. We note that red, white, and blue are the general team colors associated with the Atlanta
Braves professional baseball team. See Tex. R. Evid. 201(b), (f).
8. We note that the Philadelphia 76ers commonly use red, white, and blue as their team colors. 
See Tex. R. Evid. 201(b), (f).
9. Where Roberts' brief summarizes his argument concerning sufficiency of the evidence, it
could be read as raising the issue that accomplice testimony must be corroborated by nonaccomplice
testimony to connect him with the crime, failing which the evidence is insufficient. If he intended
to raise an issue concerning corroboration of accomplice-witness testimony, Roberts has not
provided any substantive analysis of corroboration issues in his brief. An appellant's brief "must
contain a clear and concise argument for the contentions made, with appropriate citations to the
record." Tex. R. App. P. 38.1(h). Because Roberts' brief contains no analysis of the sufficiency of
the State's evidence to corroborate accomplice-witness testimony, any such issues would have been
inadequately briefed and would be properly overruled. Cf. Ingram v. State, 213 S.W.3d 515, 520
n.8 (Tex. App.--Texarkana 2007, no pet.).