[Cite as *State v. Dieckhoner*, 2012-Ohio-805.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 96694

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## PHILIP DIECKHONER

DEFENDANT-APPELLANT

---

## JUDGMENT:
## REVERSED AND REMANDED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-543447

**BEFORE:** Keough, J., Kilbane, P.J., and Blackmon, A.J.

**RELEASED AND JOURNALIZED:** March 1, 2012

**ATTORNEY FOR APPELLANT**

Mary Elaine Hall
645 Leader Building
526 Superior Avenue, East
Cleveland, OH 44114


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

BY:   John Wojton
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH 44113

KATHLEEN ANN KEOUGH, J.:

{¶1} Defendant-appellant, Philip Dieckhoner ("Dieckhoner"), appeals the trial court's denial of his motion to suppress. Finding merit to the appeal, we reverse and remand.

{¶2} In November 2010, Dieckhoner was charged with one count of drug possession in violation of R.C. 2925.11(A). Dieckhoner moved to suppress the drugs discovered and seized by Lakewood police officer William Comerford ("Comerford"), arguing that Comerford lacked reasonable suspicion and probable cause to search him and that any consent he gave was involuntary. The following testimony and evidence was presented at the suppression hearing.

{¶3} On October 22, 2010, Comerford was driving his marked zone car on Madison Avenue in Lakewood, Ohio, when he observed a vehicle with only one working headlight traveling behind him. He pulled behind the vehicle and conducted a traffic stop. Comerford testified that the stop occurred at approximately 12:15 a.m. in a business area surrounded by a residential neighborhood.

{¶4} When Comerford approached the vehicle, he asked the driver, who was identified as Dieckhoner, for his license and proof of insurance. Comerford went to his patrol vehicle and verified that Dieckhoner's license was valid. Comerford then returned to Dieckhoner and advised him that he had only one working headlight. According to Comerford, Dieckhoner stated that he did not realize the headlight was out, so Comerford

asked him to exit his vehicle and showed him that the right, front headlight was not working.

{¶5} Comerford testified that he gave Dieckhoner a verbal warning advising him to get the headlight fixed. Comerford first testified: "He was given back his license and I told him he's all set, have a good night, and then at that point I had asked him if he had anything on his person, anything illegal, and he told me he did not. And I asked him for consent. I asked if it would be all right for me to check and he said — he gave me verbal consent." Specifically, Comerford stated that he gave Dieckhoner his driver's license back and told him "he's all set, have a good night." As Dieckhoner turned to walk towards his vehicle, Comerford asked, "[b]y the way, do you have anything illegal; guns, knives, bombs, anything[?]" Dieckhoner responded, "No." Comerford then asked "if it would be [alright] for me to check * * * [your] person and [Dieckhoner] said it would be okay." Comerford testified that a second Lakewood police officer arrived on the scene after the initial traffic stop but during the interaction with Dieckhoner. According to Comerford, this officer did not have any direct contact with Dieckhoner; rather, the officer stood on the curb, approximately five feet away, while watching the interactions between them.

{¶6} As Comerford searched Dieckhoner, he felt a small plastic bag in the right front coin pocket of Dieckhoner's pants. When Comerford attempted to see what it was, he asked Dieckhoner if it was a bag of marijuana. Dieckhoner replied, "No, it's coke." Comerford then retrieved a clear plastic bag containing a white powdery substance, which

was later identified as cocaine. At that point, Comerford secured Dieckhoner in handcuffs and advised that he was under arrest.

{¶7} Comerford testified that he questions everyone he stops whether they have any weapons, drugs, or guns on their person and that Dieckhoner's demeanor was relaxed when he asked this question. He testified that Dieckhoner was not acting suspicious and he did not have any reason to believe that Dieckhoner had drugs on him when he asked the question. He further testified that he did not impede Dieckhoner's ability to move or leave, and did not draw his gun or threaten Dieckhoner with his taser or pepper spray during their conversation.

{¶8} Lakewood police detective Amelio Leanza ("Leanza") testified that he interviewed Dieckhoner after his arrest for drug possession. According to Detective Leanza, Dieckhoner stated that he gave Comerford consent to search "because he didn't think [the cocaine] would be found because it was so small and it was in his coin pocket."

{¶9} After the hearing, the trial court denied the motion to suppress. Dieckhoner then pled no contest and the court found him guilty. The trial court sentenced him to one year of community control sanctions and 50 hours of court community work service.

{¶10} Dieckhoner appeals, raising two assignments of error for review. He contends that the trial court erred when it denied his motion to suppress because (1) he did not voluntarily consent to the pat-down search, and (2) the pat-down search was not incident to arrest or for officer safety.

{¶11} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. In deciding a motion to suppress, the trial court assumes the role of trier of fact. *Id*. A reviewing court is bound to accept those findings of fact if they are supported by competent, credible evidence. *Id*. However, a reviewing court then must independently determine, without deference to the trial court, whether the facts satisfy the applicable legal standard. *Id*., citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1977).

{¶12} In denying Dieckhoner's motion, the trial court stated: "I am going to find that the [sic] consent was given for the search." This "finding" is not in dispute. The issue is not whether consent was given, but whether the consent was *voluntarily* given. The trial court's decision is silent on this issue. On appeal, Dieckhoner argues that under the totality of the circumstances, his consent was involuntary making Comerford's search unreasonable. The State argues that the search was performed after voluntary consent.

{¶13} The Fourth Amendment to the United States Constitution prohibits warrantless searches and seizures, rendering them, per se, unreasonable unless an exception applies. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Where there is a reasonable and articulable suspicion to believe that a motor vehicle or its occupants are in violation of the law, stopping the vehicle and detaining its occupants will not violate the Constitution. *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). However, the scope of a detention "must be carefully

tailored to its underlying justification * * * and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). "The lawfulness of the initial stop will not support a 'fishing expedition' for evidence of crime." *State v. Bevan*, 80 Ohio App.3d 126, 130, 608 N.E.2d 1099 (9th Dist.1992).

{¶14} However, an officer may expand the scope of the stop and may continue to detain the vehicle without running afoul of the Fourth Amendment if the officer discovers further facts after the initial stop that give rise to a reasonable suspicion that additional criminal activity is afoot. *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Robinette*, 80 Ohio St.3d 234, 240, 1997-Ohio-343, 685 N.E.2d 762 ("*Robinette II*").

> When a police officer's objective justification to continue detention of a person * * * is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention, the continued detention to conduct a search constitutes an illegal seizure. *Robinette II* at paragraph one of the syllabus.

{¶15} Thus, if a law enforcement officer, during a valid investigative stop, ascertains "reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual." *Id*. at 241.

{¶16} "Voluntary consent, determined under the totality of the circumstances, may validate an otherwise illegal detention and search." *Id.*, citing *Davis v. United States*, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946).

**{¶17}** In *Robinette II*, the Ohio Supreme Court, relying on its decision in *Robinette I*, and the United States Supreme Court decisions in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) and *Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229, adopted a totality-of-the-circumstances test to determine whether consent is voluntary. *Id.*, at paragraphs two and three of the syllabus. Under this test,

> "the Fourth and Fourteenth Amendments require that [the State] demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Robinette II* at 242-243, quoting *Bustamonte* at 248-249.

**{¶18}** The court in *Robinette II* further explained that: "'the State has the burden of proving that the necessary consent was obtained and that it was *freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.*'" (Emphasis in original.) *Id.* at 243, quoting *Royer* at 497. "Once an individual has been unlawfully detained by law enforcement, for his or her consent to be considered an independent act of free will, the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave." *Robinette II* at 245-246, citing *Bustamonte*; *Royer*; *State v. Barnes*, 25 Ohio St.3d 203, 208-209, 495 N.E.2d 922 (1986).

**{¶19}** The facts in *Robinette* mirror those before this court. In *Robinette II*, the court determined that consent was not freely and voluntarily given based on the totality of

the circumstances. In that case, the officer stopped Robinette's vehicle for speeding. After obtaining Robinette's license and verifying its validity, the officer returned to Robinette's vehicle and asked him to exit the vehicle and walk to the rear of Robinette's car, which was in front of the patrol car. The officer returned to his patrol car and turned on a video camera. The officer then returned to Robinette, issued a verbal warning regarding Robinette's speed, and returned Robinette's driver's license. After returning the license, and without any break in the conversation, the officer asked Robinette, "One question before you get gone [sic]: are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" According to the officer, as part of the drug interdiction project, he routinely asked permission to search the cars he stopped for speeding violations. After Robinette denied having any contraband in the car, the officer immediately asked Robinette if he could search the car. "Robinette hesitated, looked at his car, then back at the officer, then nodded his head." *Id*. at 243. The officer searched Robinette's car and seized marijuana and a pill.

{¶20} The *Robinette* court was troubled by the timing of the officer's immediate transition from giving Robinette the warning for speeding into questioning regarding contraband and the request to search. *Id.* at 244. As the Ohio Supreme Court observed in *Robinette I*:

The transition between detention and a consensual exchange can be so

seamless that the untrained eye may not notice that it has occurred. The

undetectability of that transition may be used by police officers to coerce

citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to. *Id*. at 654; *see also Robinette II* at 244.

{¶21} In *Robinette II*, the Ohio Supreme Court expanded on its observation and explained:

> When these factors are combined with a police officer's superior position of authority, any reasonable person would have felt compelled to submit to the officer's questioning. While [the officer's] questioning was not expressly coercive, the circumstances surrounding the request to search made the questioning impliedly coercive. Even the State conceded, at an oral argument before the United States Supreme Court, that an officer has discretion to issue a ticket rather than a warning to a motorist if the motorist becomes uncooperative. * * * From the totality of the circumstances, it appears that Robinette merely submitted to "a claim of lawful authority" rather than consenting as a voluntary act of free will. *Id*. at 244-245.

{¶22} We find no legal distinction between *Robinette* and the case before this court. Just as the Ohio Supreme Court was in *Robinette*, we are also troubled by the timing of Comerford's immediate transition from giving Dieckhoner the warning for the improperly working headlight to questioning him about contraband and then requesting to search his person.

{¶23} Comerford gave Dieckhoner a verbal warning for the improperly working headlight and told Dieckhoner that "he was all set and to have a good night." As Dieckhoner turned to walk toward his car, Comerford then asked, "[b]y the way, do you have anything illegal; guns, knives, bombs, anything[?]" Unlike the facts in *Robinette*, there was no departmental or "drug interdiction policy" that required Comerford to question Dieckhoner about weapons or drugs. With the second officer standing five feet

away, Dieckhoner denied having any contraband. Comerford immediately asked for consent to search him and Dieckhoner agreed.

{¶24} Comerford testified that he asks everyone he stops if they have any weapons, drugs, or guns on their person, and that he had no particular reason for asking Dieckhoner to search his person. In fact, Comerford testified that Dieckhoner was not acting suspicious in any way and that Dieckhoner was free to leave.

{¶25} Although Detective Leanza testified that Dieckhoner stated he consented to the search because he did not think Comerford would find the drugs in his pocket, the test for whether consent was voluntary depends on the totality of the circumstances at the time consent was given. Dieckhoner's reasoning for consenting to the search given after being arrested and to another law enforcement officer while in police custody does not withstand the State's burden of clearly demonstrating that Dieckhoner's consent was voluntary.

{¶26} After considering the totality of circumstances in the instant case, including Comerford's testimony that Dieckhoner appeared calm, the seamless transition between the detention and the request for consent, the fact that Comerford had no reasonable suspicion that Dieckhoner was involved or engaging in criminal activity, and the presence of another uniformed police officer, this court finds there was a sufficient show of authority such that Dieckhoner would not believe at the time that he was free to get in his car and drive away. Under these circumstances, any reasonable person would have felt

compelled to submit to the officer's search, rather than consenting as a voluntary act of free will.[1]   *See Robinette* at 244-254.

**{¶27}** Accordingly, the trial court erred in denying Dieckhoner's motion to suppress.

**{¶28}** Dieckhoner's first assignment of error is sustained.

**{¶29}** In the second assignment of error, Dieckhoner continues to challenge the search, arguing that the pat-down was not incident to his arrest or Comerford's safety. However, we need not address this issue because of our determination that Dieckhoner's consent was not voluntary.   *See* App.R. 12(A)(1)(c).

**{¶30}** Therefore, judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

---

[1]It is worth reiterating the Ohio Supreme Court's footnote in *Robinette II*, drafted 15 years ago:

> If police wish to pursue a policy of searching vehicles without probable cause or reasonably articulable facts, the police should ensure that the detainee knows that he or she is free to refuse consent despite the officer's request to search or risk that any fruits of any such search might be suppressed. While we are not mandating any bright-line test or magic words, when a police officer informs a detainee that he or she does not have to answer further questions and is free to leave, that action would weigh persuasively in favor of the voluntariness of the consent to search.   *Robinette II* at fn. 6.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. Case remanded to the trial court for further proceedings consistent with this opinion.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


KATHLEEN ANN KEOUGH, JUDGE

PATRICIA ANN BLACKMON, A.J., CONCURS;
MARY EILEEN KILBANE, P.J., DISSENTS WITH SEPARATE OPINION.

MARY EILEEN KILBANE, P.J., DISSENTING:

**{¶31}** I respectfully dissent. I would affirm the trial court's denial of Dieckhoner's motion to suppress.

**{¶32}** The majority relies on *Robinette II* in support of its decision. However, I find the circumstances in *Robinette II* factually distinguishable from the instant case.

**{¶33}** As the *Robinette II* court recognized, voluntary consent is an valid exception to warrantless searches and seizures. *Id.*, 80 Ohio St.3d at 241, 685 N.E.2d 762. The *Robinette II* court stated: "[v]oluntary consent, determined under the totality of the circumstances, may validate an otherwise illegal detention and search." *Davis,* 328 U.S. at 593-594, 66 S.Ct. 1256.

**{¶34}** In *Robinette II*, the officer video recorded the interaction and had Robinette stand in between his car and the police cruiser. The officer asked Robinette, "'One question before you get gone [sic]: are you carrying any illegal contraband in your car?

Any weapons of any kind, drugs, anything like that?' Robinette denied having any contraband in the car. [The officer] then immediately asked Robinette if he could search the car. Robinette hesitated, looked at his car, then back at the officer, then nodded his head." *Id.* at 243.

{¶35} Whereas in the instant case, the interaction between Comerford and Dieckhoner was not video recorded, Dieckhoner was not instructed to stand in between the police cruiser and his car, and Comerford did not ask Dieckhoner "one question before you get gone." Rather, Comerford told Dieckhoner, "[you're] all set, have a good night," and as Dieckhoner walked towards his vehicle, Comerford said, "[b]y the way, do you have anything illegal; guns, knives, bombs, anything[.]" Dieckhoner responded, "No." Comerford then asked "if it would be [alright] for me to check * * * [your] person and [Dieckhoner] said it would be okay."

{¶36} In *Robinette II*, the defendant testified that he was "shocked" at the officer's question, he "automatically said yes," and he did not believe that he was at liberty to refuse the officer's request. *Id.* at 244. However, Dieckhoner did not testify in the instant case. Unlike *Robinette II*, here there is no testimony from Dieckhoner stating that he: (1) was under duress; (2) did not feel free to leave; (3) was "shocked" at Comerford's question; or (4) "automatically said yes." Moreover, there was no testimony from anyone contradicting that Dieckhoner's response was anything but voluntary.

**{¶37}** In fact, the testimony from the officers was consistent and indicates that Dieckhoner was free to leave and was calm and polite during the encounter. Comerford testified that Dieckhoner was relaxed when he asked the question. Leanza testified that he interviewed Dieckhoner after his arrest and Dieckhoner stated that he gave Comerford "consent because he didn't think [the drugs] would be found because it was so small and it was in his coin pocket." During the interview, Dieckhoner was not under duress and did not indicate that Comerford forced him to consent to the search. Additionally, Comerford did not impede Dieckhoner's ability to move or leave, he did not draw his gun or threaten Dieckhoner with his taser or pepper spray during their conversation.

**{¶38}** Furthermore, the trial judge was in the best position to resolve issues of fact and witness credibility and believed the officers' testimony. A reviewing court is bound to accept those findings of fact if supported by competent, credible evidence. *See State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172, citing (1994), *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990). Here, the trial court determined that Comerford did receive Dieckhoner's voluntary consent before the search.

**{¶39}** Thus, based on the circumstances of the instant case, I would find the trial court properly determined that Comerford obtained Dieckhoner's voluntary consent before the search.

**{¶40}** Accordingly, I would affirm the trial court's judgment denying Dieckhoner's motion to suppress.